## No. 13,161.

### Moss *v.* The People.
(18 P. [2d] 316)

Decided December 27, 1932.

Mr. E. L. Dutcher, for plaintiff in error.

Mr. Clarence L. Ireland, Attorney General, Mr. Wallace S. Porth, Assistant, for the people.

*En Banc.*

Mr. Justice Campbell delivered the opinion of the court.

The defendant Nelivelt Moss was found guilty of murder in the first degree and sentenced to death. His victim was an aged woman, Rena Schierenbeck, who lived in the town of Pitkin, Gunnison county, Colorado, across the street and about forty feet from the residence of the mother of the defendant and her husband, the defendant's stepfather, with whom the defendant made his home. During the latter part of February, 1932, Mrs. Schierenbeck was robbed of approximately $20 and she accused the defendant of taking the money. The defendant had for some time been in the habit of performing small favors for Mrs. Schierenbeck, such as getting her mail from the post office, bringing groceries to her from the store, shoveling paths in the snow and such other errands as might be asked of him by her to do. Soon

after the deceased missed this money she met the defendant on one of the streets of the town and accused him of stealing the same, whereupon the defendant decided not to perform any more favors for her. Notwithstanding this decision upon his part, some days later he renewed his services to the deceased in some particulars. On the afternoon of Tuesday, March 8, 1932, the defendant and Mrs. Schierenbeck met on one of the streets of the town and defendant said she called him a "black thief" and made use of vulgar and obscene epithets which should not be reproduced in this opinion. The following day, Wednesday, March 9, the defendant worked at the sawmill in Pitkin. The night of March 8, after eating supper with his mother and stepfather, defendant left the house stating that he was going to the home of one Ray Sanchez. On his way there he is said to have drunk half a pint of whiskey and he cached the balance of the pint near a water tank close to the Sanchez home. He then went into the Sanchez house where he remained for some time. Just how long he remained there the evidence does not disclose with any degree of accuracy. Neither Sanchez nor his wife observed anything unusual about his condition at the time. After leaving their home he drank the remaining part of the whiskey. In the early morning of the following day, March 9, some of the neighbors noticed that the house of Mrs. Schierenbeck was on fire. Along about 3 o'clock of this morning the fire had gained such headway that the roof on the front part of the house fell in. The house was burned to the ground and the body of Mrs. Schierenbeck, which was on the bed in the bedroom which she used, was kept, by those who gathered at the fire, from being completely burned by shoveling snow upon it. After the fire an examination of the premises disclosed that the lock on the door of the house of the deceased was not fastened. A heavy lamp was found about five feet from the stand on which it usually stood, and the burner had been screwed off, indicating that the kerosene in the lamp had been poured out. This lamp

was one which usually stood on the marble table in the front room of the house, which, however, was not used by the deceased during the winter months. There was some conflict in the evidence as to the time that this fire was first observed, and also as to the time when the house was completely destroyed. The defendant was not seen at the fire while the building was burning. A post-mortem examination of the body of the deceased disclosed a fracture over the right eye, which had been caused by a heavy blunt instrument. The fractured edge showed considerable char which indicated that the fracture occurred before the body was burned. Death, which could have resulted from the blow or fracture, was hastened by suffocation. In other words, the deceased died as the result of the injury or fracture over the right eye which probably was aided or hastened by suffocation from the smoke of the burning building.

On March 11, the defendant was taken into custody by the sheriff of Gunnison county and was brought to Gunnison, the county seat, and placed in the county jail for investigation. His mother and stepfather were also arrested and brought to Gunnison where they were confined in the city jail, where they remained until the morning of March 21 when they were released. The body of the deceased was removed to Gunnison where a post-mortem was held on March 10. One of the physicians who participated therein testified that the death of Mrs. Schierenbeck resulted from a fracture over the right eye which was aided by suffocation, and the fracture was caused by a heavy blunt instrument. After the post-mortem, and after the examination of what remained of the house of Mrs. Schierenbeck, the civil authorities reached the conclusion that she had been first mortally injured by some one who had entered her home and that the perpetrator of the crime had then set fire to her house hoping to cover up the crime, and this led to the arrest of the defendant for investigation. The defendant when arrested stated that he knew nothing of the fire and that on the evening

preceding the same he had been at the home of his mother and stepfather all evening. Still later, and after talking to his stepfather, he said that on the evening the crime was committed he had gone to the home of Ray Sanchez on an errand and had then returned home and had played pitch all that evening with his stepfather. When the defendant was told that the house was on fire he watched it from the porch of his home instead of going across the street to the fire. His stepfather, who asked him to come to the fire to help, described his actions at that time as being "crazy," and still later on that morning defendant's mother observed that his actions were unusual and she asked him if he were sick. A week or more after the defendant had been placed in jail he signed a confession admitting that he had struck the deceased on the head with a lamp and had then set fire to her house in order to get even with her for calling him vile names on the street at the time they met as hereinabove stated.

The defendant upon this review relies for reversal upon the following alleged errors committed by the trial court:

■■ 1. During the trial the prosecution, it is said, produced evidence tending to show immoral conduct and bad reputation and character of the defendant, but no attempt was made to show his general reputation and character in the community where he lived. The effort was restricted to specific acts of bad character. Counsel says that the district attorney produced evidence that the defendant was a habitual patronizer of a place of ill repute, a pool hall in the town of Pitkin, and says that this, in effect, was an attack by the people upon the defendant's character. He says that the prosecution in a criminal case may not initially attack the defendant's character. If it desires to make such attack it may not do so unless and until the defendant himself offers to prove his good character, and cites in support of the proposition Underhill on Criminal Evidence (3d Ed.), p. 174, §137, and Wigmore on Evidence (2d Ed.), p. 274, §57. Counsel for

defendant evidently misconceives the purpose for which this evidence was introduced. It was not for the purpose of showing that the defendant was not of good character, or that his general reputation for peace was bad. This evidence was introduced for the purpose of showing that on the night in question, when Mrs. Schierenbeck was killed, the defendant was not in the pool hall where he almost always was in the night time. The attorney general well says in his brief that it is sufficiently apparent from the record that this evidence was properly introduced and admitted by the court to show that the defendant was, on the night in question, elsewhere than at the pool hall, where he habitually passed the time, and so might have been, and probably was, at a place where he could have done the things which were charged against him in the information. There is not any evidence in the record that the defendant was thought any the less of because he frequented the pool hall of Pitkin, or that it was of bad repute, or was attended only by the evil minded. No question was asked by the district attorney of any witness as to the character of the defendant.

The testimony which was elicited by the people tending to show that the defendant gambled was not introduced by the state to show bad character, but for the purpose of showing that the defendant might have been in need of money and might have killed the deceased to secure her money inasmuch as he knew that she kept a fairly large sum of money at her house. In *Warford v. People,* 43 Colo. 107, 96 Pac. 556, speaking of this character of evidence, the court, at page 112, said: ''It is always proper to show the motive which may have prompted the accused to commit the crime for which he is being tried, and the intent with which he committed the acts which it is claimed constitute that crime; and evidence which tends to prove either of these facts is relevant to establish the commission of the crime for which he is on trial, even though such evidence, for the purpose indicated,

may tend to show the commission of similar and independent crimes by him." It was not error to permit such testimony.

■ 2. Upon cross-examination of the people's witness, Mrs. Sanchez, counsel for defendant sought and offered to show that the witness had been in the presence of the defendant before when he had been under the influence of liquor. The district attorney objected to this question because it was not proper cross-examination, and the court sustained the objection. Defendant upon this review now argues that the court's ruling was erroneous because evidence of the conduct of the accused on previous occasions, when he was intoxicated, is competent as bearing on the question of his intoxication when he committed the crime charged. Such may be the doctrine, under a state of facts different from that contained in this record, but the objection to this question was sustained by the court, and properly so, because it involved and concerned matters not covered by the state on direct examination. In *Mitsunaga v. People,* 54 Colo. 102, 108, 129 Pac. 241, we stated that questions not germane to matters about which the witnesses testified, are not proper cross-examination.

■■ 3. The defendant assigns and argues that the court committed error in admitting in evidence a microscopic slide containing a specimen of blood taken from the body of Mrs. Schierenbeck. Whipple, a witness for the people, was asked to make an examination of specimens of blood taken from the body of the deceased. He took a portion of a clot of blood from the skull and also from a red smear taken from a piece of the ticking on the bed where Mrs. Schierenbeck was lying on the night of the killing. These specimens were treated by Whipple and placed upon the microscopic slide which was admitted in evidence over the objection of the defendant. Counsel for defendant admits that if the witness was sufficiently qualified as an expert in this particular line, the defendant was not prejudiced when the exhibit was admit-

ted by the court, but, if he was not sufficiently qualified, the defendant was prejudiced. Whipple stated that he had been engaged in chemical laboratory business for about twelve years. He received his preliminary work at the University of Colorado and later at Fitzsimons General Hospital, and he testified that he is equipped and qualified to make chemical and microscopic tests of this character. Whipple, however, is not a graduate of any university or college and has not received a certificate or license to engage in work of this character from the state of Colorado, but he holds a clinical laboratory certificate by the United States Veterans Bureau. Counsel cites and relies upon the proposition stated in Underhill on Criminal Evidence (3d Ed.), p. 742, §515, which reads: "Though any witness may testify that a stain looks like a blood stain, only a skilled physician or microscopist should be permitted to give an opinion, after analysis, on the question, was the stain in question caused by the blood of a human being or by that of other animals." It is true that Whipple was not a physician. He was, however, according to the undisputed evidence a microscopist and the mere fact that he was not a graduate of the university or a college does not disqualify him. There was no error in permitting Whipple to testify. In *Ausmus and Moon v. People,* 47 Colo. 167, 107 Pac. 204, this court said: "An expert is one who has superior knowledge of a subject and is, therefore, able to afford the tribunal having the matter under consideration a special assistance, and his knowledge may have been acquired by professional, scientific or technical training or by practical experience in some field of human activity, conferring on him an especial knowledge not shared by men in general." We further said in that case: "The rule established by the weight of authority is that the decision of the trial court as to the qualification of any expert is never reversed, except in cases of abuse." There certainly was no abuse of discretion in this case. Whipple's testimony was properly received.

4. We think it apparent that astute counsel for the defendant relies for reversal chiefly because of the admission by the trial court of the alleged confessions of the defendant. The assignment of error to this ruling of the court we now consider. Soon after the death of Mrs. Schierenbeck the civil authorities of the county suspected that the defendant killed her, and he was placed under arrest and thereafter confined in the county jail in the town of Gunnison, county seat of Gunnison county. The sheriff of that county, Mr. Lindsley, also caused the arrest of the defendant's mother and stepfather and they too, of which the defendant was aware, were confined in jail because of certain suspicious circumstances that tended to show their possible participation in the crime. The sheriff had repeated interviews with the defendant in the county jail in which he urged him to tell the truth about his connection with the burning of the Schierenbeck house. At first the defendant denied all knowledge as to the perpetrator of the unlawful act. When arrested the defendant said he knew nothing about the fire and that on the night when the building burned he was at home all the evening just across the street from the burned building. After talking with his stepfather he changed his story and stated that he had gone to the home of Ray Sanchez on an errand and had returned home sometime about midnight and played pitch all the evening with his stepfather. He clung to this statement for some days and until the sheriff again visited him in the jail and told him that he had been telling different stories about his movements on the night of the fire and he wanted him to tell the truth about his connection, if any, with it. The defendant then asked the sheriff if he would release his mother and stepfather if he told the truth. The sheriff testified that he replied to the defendant's question by saying that the parents would be released provided they are not implicated in the crime. The defendant, however, in his story says that the sheriff promised him he would turn them loose if he, the de-

fendant, would make a confession. It thus appears that there was a conflict, and a material one, between the testimony of these two witnesses. If the sheriff's testimony is true there was no promise by him of the release of the defendant's parents as such release depended upon another circumstance which was whether or not they were implicated in the crime.

In *Fincher v. People,* 26 Colo. 169, 56 Pac. 902, at page 174, this court said: ''The trial judge, on a conflict in the evidence, regarding the voluntary character of the statement purporting to be the confession of the defendant, resolved the question in favor of the people, and its admission under such circumstances, being, to some extent, in the discretion of the court, his action in this respect cannot be disturbed when the evidence, as it does in this case, at the time when the motion to withdraw it was interposed, supports the conclusion that the confession was a voluntary one.''

In *O'Donnell v. People,* 71 Colo. 113, 114, 204 Pac. 330, the facts and circumstances were quite similar to those in the case now before us. The court there said: ''Where such a statement contains an admission that it was freely and voluntarily made, without threats or promises, and that admission is supported by the testimony of persons present at the time, the statement is admissible in evidence. In passing upon the question a considerable discretion is vested in the trial court. 16 C. J. 735. That discretion was not abused in the instant case.''

The typewritten confession of the defendant, which was brought up in the record, contains the statement, among other things, that the defendant ''has not been threatened or abused and has not been promised anything what would happen if I did tell the truth and I make the statement knowing that it may be used against me. This is my own statement and it is all the truth.'' Among the leading cases in this jurisdiction upon the subject of confessions of a defendant in a criminal case are *Fincher v. People,* 26 Colo. 169, 56 Pac. 902; *Mitchell*

*v. People,* 76 Colo. 346, 232 Pac. 685; and *Osborn v. People,* 83 Colo. 4, 262 Pac. 892. In the Mitchell case it is said that the question of the admissibility of a confession is primarily one for the trial court and in the absence of a clear abuse of discretion, that ruling will not be interfered with. In the Osborn case, at page 39 of the opinion, it is said: "Whether or not a confession was voluntary, is primarily a question for the trial court. Its admissibility is largely within the discretion of that court; and on review, its ruling thereon will not be disturbed, unless there has been a clear abuse of discretion."

Counsel for the defendant at the trial below and upon this review admits that, according to the decision in the Mitchell case and in the Osborn case, and also in the case of *Moya v. People,* 88 Colo. 139, 293 Pac. 335, the question whether the confession is voluntary is one primarily for the trial court and in the absence of a clear abuse of its discretion, its ruling will not be disturbed on review. But counsel strenuously contends that there was a clear abuse of discretion in this case and he says that the record supports him in that assertion. When the question of the admissibility of the defendant's confession in this case was broached the defendant requested that the jury be excused while testimony was taken before the presiding judge as to its admissibility. The court, at the close of the evidence on this phase of the case, held that no improper influence was brought to bear upon the defendant to secure his confession; that he was sufficiently warned that the same might be used against him and that no promise was made by the civil authorities as an inducement to the defendant to make a confession. Our reading of the record satisfies us that the decision of the trial court was right and that the defendant's written confession was properly received. It was freely and voluntarily made, without having been induced by any promised benefit or by the fear of any threatened injury. The confession of the defendant, as

the same was dictated to, and transcribed by, a stenographer, is as follows:

"Nelivelt Elliott is the name I go by. My right name is Moss. My Mother is Mrs. George Williams, and my age is 20 and I will be 21 the 11th day of August, A. D. 1932.

"On Wednesday March 9th I met Mrs. Rena Schirenbeck in the Town of Pitkin, in Gunnison County, Colorado, between the Crystal Store and the Mason's store on the Main street in the Town. I said, 'Good evening, Mrs. Schrienbeck.' She said, '* * *, you are a black nigger theif.' And I said just to myself, 'I would get even with her.' I thought to my self I would kill her. I was going up town and she was going toward home. The more I thought of it the more it beared on my my mind. Well, I do not know exactly how long I stayed up town, and then I came home and eat supper. I got through supper about 7:00 o'clock. Then I gets up and goes up to Ray Sanchez. I stayed up there pretty late, until about 11:30 or 12 o'clock. Well, I was setting there thinking about it all the time I was at Sanchez—and I decided I would go down and kill her and set the house on fire. I came down the railroad track, and then turned off at the crossing, and then I came out to the Main Street and past home and went through the Henderson place, across the porch, and into the back of Mrs. Schrienbeck's. I went in the door that she uses. The screen was hooked, but the door was not locked. I walks on the inside in the kitchen, struck a match and walked over to the table and lit the lamp, and then into her bedroom. I carried the lamp into the bedroom with me. She was lying in bed with her back to me when I went in, and then she raised up and said 'Who is that?' And I hit her with the lamp in the head. I do not know whitch part of the head, then I walked out into the front room. I hit her as hard as I could with the lamp in my hand—with the bottom part of the lamp. It was a lamp with a heavy bottom to it. Then after I struch her, I dropped the lamp and ran out

and shut the door as quick as I could. Then I went into the front room struch matches where I could see to get into the front room, and there sets a table in the middle of the floor, with two lamps filled with coal oil, and I taken the lamps and poured coal oil on the sofa, then struck a match to it, and came out just as quick as I could, and then went home and unlocked the door, and went into my bedroom and then to bed. When I was leaving her room I heard her moaning, but that was the only time. I think I got home after midnight, but I don't know for sure.

"The screen was hooked and I reached through where the screen was torn and unlocked it at the doorn where I went in Mrs. Schrienbeck's house.

"After I struch Mrs. Schrienbeck I went through the kitchen into another room into the front room next to the railroad trach, and the table was setting there with two lamps on it and I taken the lamps and piurned coal oil on the sofa in the right had corner near the railroad. I poured coal oil on the floor and on the wall paper.

"When I went into my house, I don't know whether I lit the lamp or not, they were all in bed, and the lights all out. Neither George nor Mother said anything to me.

"Mrs. Robbins called that there was fire when I had been in bed I guess about 3 hours. They all got up out of bed and George tried to shoot the gun and he couldn't break it down. Then they all went over to the fire, I mean George, Rose, Mother and Mrs. Robbins, Louise her little girl, and I went out into the kitchen and looked at the fire and then I went back to bed. I did not go to the fire because I did not feel like I wanted to go over because I was the one that did it. And I did not want to see it.

"There was no one else in on it, and I did not tell anyone what I was going to do.

"I make this statement that I have not been threatened or abused, and have not been promised anything what would happen if I did tell the truth, and I make this

statement knowing that it may be used against me. This is my own statement and It is all the truth.

Nelivelt Moss.''

This confession was orally spoken by the defendant to a stenographer who took the same down verbatim and it was taken in the presence of three witnesses whose names are subscribed to the same below the signature of the defendant. Almost immediately after the confession was signed by the defendant, the deputy district attorney, proceeding under information then given him by the defendant himself, made a rough sketch or drawing of Mrs. Schierenbeck's home and after the same was finished the defendant, without any suggestion from any one, endorsed upon the sheet of paper on which the draft was made, the following language: ''This is the correct drong of Mrs Schrienbeck where I kill hier'' and the defendant wrote his name under these words. This drawing was introduced in evidence and is marked Exhibit G and was witnessed by the sheriff and by the deputy district attorney and by another person. Even if the formal written confession of the defendant should be eliminated from the case, this paper in and of itself might be taken as a confession by the defendant that the defendant killed Mrs. Schierenbeck by setting fire to the house in which she was sleeping at the time it was destroyed by the fire.

The judgment is affirmed. It is further ordered that it be executed during the week commencing Sunday, March 5, 1933.