[Nos. 26207-6-I; 32008-4-I.    Division One.    August 1, 1994.]

The State of Washington, *Respondent*, v. Steven Richard Matthews, *Appellant*.

*Elaine Winters* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Donald Raz, Senior Deputy; Christine O. Gregoire, Attorney General,* and *Cheryl B. Carey, Assistant,* for respondent.

KENNEDY, J. — Steven Richard Matthews appeals his jury conviction of murder in the first degree.[1] He contends *inter alia* that the trial court abused its discretion in admitting evidence of Matthews' financial situation and recent bankruptcy in support of the State's theory that Matthews had a financial motive to commit what began as a robbery but ended in a murder.[2] We affirm.

## FACTS

Matthews was convicted by a jury of murder in the first degree. The victim, Daniel McCleary, owned the West Coast Gold and Silver Exchange. This business was located in a strip mall between a law office and a beauty salon. McCleary bought and sold precious metals, coins, jewelry and flatware. The business was divided into a showroom and a small office in the back.

Between 11 a.m. and noon on October 31, 1989, Junoh Lee, the owner of the adjacent beauty salon, came into the Exchange to retrieve some supplies.[3] While he was at the Exchange, Lee saw a man who looked like Matthews sitting in the office while McCleary was waiting on some customers in the showroom.

---

[1]Matthews later appealed the trial court's denial of his motion for a new trial pursuant to CrR 7.6(a)(8). Although these appeals have been consolidated, Matthews has not assigned error to, or argued any issues related to, the posttrial ruling. Accordingly we treat the later appeal, cause 32008-4-I, as abandoned. RAP 10.3(g); *see, e.g., Daughtry v. Jet Aeration Co.,* 91 Wn.2d 704, 709-10, 592 P.2d 631 (1979) (the court will consider only a claimed error that is included in an assignment of error or clearly disclosed in the associated issues pertaining thereto, unless the nature of the challenge is perfectly clear).

[2]Matthews' remaining contentions are treated in the unpublished portion of this opinion.

[3]Lee and McCleary shared a storage area behind McCleary's small office.

At approximately noon, the four people who were working next door in the law office (Scott Blair, Mark Watanabe, Linda Clark and Bridgette Cassel) heard bumps, thuds and screams coming from McCleary's business. As Cassel and Clark called 911, Blair ran next door to investigate.

When Blair entered the Exchange he could see, through the mirrored office window, the silhouettes of two men standing in McCleary's office. The more bulky silhouette was lunging at the other silhouette. Blair ran to his office and told Watanabe to call 911. Learning that others were calling, Blair and Watanabe went back to McCleary's shop. Through a window in the closed office door, Blair saw Matthews with a knife in his right hand, lunging twice at McCleary's neck. As Matthews lunged, McCleary sank down to his knees.

Blair opened the office door and then turned and yelled, "He has a knife". Both Blair and Watanabe ran from the office area and out of the shop. Watanabe went back to the law office. Blair stood outside McCleary's business, watching as Matthews came out the front door.

Blair then watched Matthews walk to a red or maroon Ford Aerostar van. Blair believed that the license plate was California, number 2LRK 391.[4] Matthews' California plates on his maroon Aerostar van were 2LRX 391, only one letter off from Blair's observation. Blair gave the license plate number to Clark, then returned to the back room of the Exchange where he found McCleary dead. The license number Blair gave and the description of the vehicle were later broadcast on television news.

The crime was investigated by King County Police. Detective Larry Peterson was the lead detective. None of the fingerprints taken from various locations at the scene matched Matthews'. All of the blood collected at the scene was the same type as McCleary's. No murder weapon was found at the scene.

---

[4]This license number was later found to be registered to a 1988 Buick, not a red or maroon van.

As part of the investigation, Peterson tried to determine if the murder had been preceded by a robbery. Peterson requested Roger Northway-Meyer, McCleary's part-time employee, to examine the business and determine if anything had been taken. Northway-Meyer indicated that, because of McCleary's inadequate inventory methods, it was difficult to be certain, but he could not find any merchandise that was unaccounted for. Northway-Meyer explained that the back office was not normally open to customers. McCleary would only invite people he knew very well to the back office, and usually only by appointment. Peterson examined McCleary's appointment book and found no mention of Matthews' name.

Sally Fitterer, an assistant King County medical examiner, determined that McCleary died from one or more of five potentially fatal stab wounds. She observed a total of 14 stab or slash wounds to McCleary's body.

On November 2, 1990, Detective Peterson was contacted by attorney Tony Savage, who represented Matthews. Savage and Peterson arranged a meeting with Matthews that same day. Matthews told Peterson that Matthews owned a vehicle of the same type as described on television as the getaway vehicle, and that its license plate was one letter off from the reported plate number. Matthews also admitted that he had met McCleary, the day before the murder, at the Exchange, when he went there to have his wife's ring appraised.

Matthews told Peterson that he had an alibi for the time of the murder. Matthews claimed that, after a morning jog, he returned to his home around 11:36 a.m. After working on a problem with his car, Matthews claimed he showered and stayed home until 1:45 p.m., when he went to pick up his wife.[5]

Peterson examined Matthews' van. The front license plate was missing but there was no damage to the plate holder.

---

[5]Peterson also spoke to the Matthews' babysitter, Diane Dinsmore, who contradicted Matthews' alibi. Dinsmore recalled that, on the day of the murder, Matthews did not come home until 1:15 p.m. Dinsmore remembered Matthews acting nervous on that day, after he returned. Matthews borrowed Dinsmore's car to pick up his wife, and later to take his kids trick-or-treating.

Various areas where hands and feet would have touched the van had been cleaned, while the remainder of the van remained dirty.

A lineup was held on November 7, 1989. Blair immediately picked Matthews.[6] Blair also identified Matthews' van as the one he saw on the day of the murder.[7]

At trial, Matthews claimed that he was not the person who killed McCleary.

### The Evidentiary Rulings

The trial court, in response to a pretrial motion, barred the State from using the face page from the Matthews' bankruptcy petition in its case in chief. However, the State, on cross examination, asked Mrs. Matthews about the couple's bankruptcy. Matthews moved for a mistrial, arguing that the State had violated the pretrial order. The trial court denied the motion, ruling that the scope of its pretrial order had been limited to the introduction of the face page of the bankruptcy petition and did not extend to oral testimony about the bankruptcy.

Matthews moved to strike and requested a limiting instruction related to Mrs. Matthews' testimony regarding the bankruptcy. Matthews argued that the reference to his prior bankruptcy was not relevant and was highly prejudicial.[8] Matthews also asked the court to prohibit any further questioning about his financial condition. The court denied Matthews' motion, finding that Mrs. Matthews' testimony was

---

[6]At trial, Blair admitted, during cross examination, that he did not remember Matthews having a mustache, although Matthews had one at the time of the lineup and at trial.

[7]At the trial some inconsistencies in Blair's description of Matthews' van were brought out. Blair first described the van to the 911 operator as a burgundy Astro van. On direct examination Blair testified that he thought the van was actually a Ford Aerostar. In addition, Blair first testified that the van he observed had two back doors, but later changed his testimony and stated that the van actually had only one back door.

[8]As an initial matter the State contends that Matthews did not preserve his assignment of error as to relevance. We disagree, and consider Matthews' argument.

at worst, . . . a foundational question [as] to what the financial situation of the parties may have been in October of 1989. And standing by itself, is not clearly irrelevant. . . . On the other hand, it's a jury issue as to what motive, if any, existed for the defendant to commit the crime. And certainly, if the facts indicate that the defendant in fact was in dire . . . straits as of October 31, 1989, the jury may conclude that in fact that represents an explanation, a motive for the crime.

Verbatim Report of Proceedings vol. 6, at 137. The trial court concluded that the issue was not one of relevance, but rather, whether or not the mention of Matthews' bankruptcy would be tied into Matthews' financial situation at the time of the murder.

After the trial court's ruling, the State asked additional questions designed to demonstrate Matthews' financial condition at the time of the crime. Specifically, the State asked Mrs. Matthews about the value of her wedding ring, the fact that she had to sell it after her husband was arrested, her and her husband's employment status and income level, the amount of their rent payment, how much they paid their babysitter, how many cars they owned, and whether they were making payments on their van. From Mrs. Matthews' answers, a rational jury could have concluded that the Matthews were living beyond their means.

### DISCUSSION

■ The admission of relevant evidence is governed by ER 401[9] and is within the sound discretion of the trial court. *State v. Mak*, 105 Wn.2d 692, 702, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986). However, even relevant evidence may be excluded by the trial court if its probative value is substantially outweighed by the danger of unfair prejudice. *Mak*, at 703; ER 403. This court reviews evidentiary rulings for an abuse of discretion. *State v. Halstien*, 65 Wn. App. 845, 849-50, 829 P.2d 1145 (1992), *aff'd*, 122 Wn.2d 109, 857 P.2d 270 (1993).

---

[9]ER 401 provides:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Matthews argues that the trial court erred in allowing irrelevant and prejudicial evidence about the couple's financial situation. Matthews contends that, because the State was unable to introduce any evidence of a robbery or an attempted robbery, evidence which would imply that Matthews had a financial motive for committing the murder is irrelevant. Matthews also contends that evidence of a recent bankruptcy is not relevant because it does not indicate poor financial circumstances. *See United States v. Reed*, 700 F.2d 638, 642 (11th Cir. 1983) (the mere fact that a defendant is in bankruptcy in no way demonstrates that the defendant had any particular need for money).

■ We find no abuse of discretion by the trial court in allowing this evidence. While we agree with Matthews that a bankruptcy *relieves* financial distress, this evidence was presented as a foundation for other evidence that Matthews was living beyond his means at the time of the murder. From this evidence, the State crafted its theory that McCleary's murder was the result of an interrupted robbery by a financially pressured man.

The State's theory of interrupted robbery is a reasonable theory, in view of the evidence that Matthews had only met McCleary the day before, visiting him for an hour and a half while Matthews had his wife's ring appraised by McCleary. Matthews could credibly have argued that he had no possible motive to kill a veritable stranger. Living beyond one's means could reasonably provide a motive for robbery, which in turn could reasonably provide a motive for murder of the robbery victim.

■ The human mind searches for a rational explanation for an irrational act of murder of a shopkeeper in his store in a shopping mall at high noon on a seemingly normal working day. Robbery, and a desire to leave no witnesses, is the most rational explanation for such an event. In these circumstances, whether the accused person had any motive for robbery becomes a relevant subject for inquiry; if not, the likelihood of that person being the assailant is rationally reduced. Notwithstanding that motive is not an element of

the crime of murder, it is still a permissible area of inquiry. *State v. Haga*, 13 Wn. App. 630, 637, 536 P.2d 648, *review denied*, 86 Wn.2d 1007 (1975), *cert. denied*, 425 U.S. 959 (1976).

Matthews also argues that the trial court erred in not conducting an ER 403 probative value versus prejudice balancing on the record.

While a more thorough balancing on the record would have enhanced our ability to review,[10] the trial court essentially did the necessary balancing when it concluded:

> [I]f the facts indicate that the defendant in fact was in dire or significant financial straits as of October 31, 1989, the jury may conclude that in fact that represents an explanation, a financial motive for the crime.

Verbatim Report of Proceedings vol. 6, at 137. We, therefore, reject Matthews' contention that there was no balancing on the record.

Matthews next argues that the trial court erred when it allowed the State to present highly prejudicial evidence of his poor financial condition, because the inference that poverty leads to crime is an impermissible inference:

> The *lack of money* by A might be relevant enough to show the probability of A's desiring to *commit a crime* in order to obtain money. But the practical result of such a doctrine would be to put a poor person under so much unfair suspicion and at such a relative disadvantage that for reasons of fairness this argument has seldom been countenanced as evidence of the graver crimes, particularly those of violence:
>
> . . . .
>
> Nevertheless in cases of merely peculative crime (such as larceny or embezzlement) . . . the fact that he was in need of it at the time is decidedly relevant[.]

2 John H. Wigmore, *Evidence* § 392(2)(a) (James H. Chadbourn rev. ed. 1979). *See also State v. LeFever*, 102 Wn.2d 777, 785, 690 P.2d 574 (1984) (refusing to allow evidence to link robbery to heroin habit; "[t]he resultant prejudice to one accused of a crime completely overwhelms any possible rel-

---

[10]*See Carson v. Fine*, 123 Wn.2d 206, 226, 867 P.2d 610 (1994) (while a balancing of probative value versus prejudicial effect on the record is helpful, it is not essential).

evance or probativeness"), *overruled on other grounds by State v. Brown*, 111 Wn.2d 124, 761 P.2d 588 (1988), *adhered to on rehearing*, 113 Wn.2d 520, 782 P.2d 1013, 787 P.2d 906, 80 A.L.R.4th 989 (1989); *United States v. Zipkin*, 729 F.2d 384, 390 (6th Cir. 1984) (noting in dicta that to establish motive for a theft offense by demonstrating impecuniosity of defendant requires a chain of inferences that is highly speculative and therefore of little probative value); *Davis v. United States*, 409 F.2d 453, 458 (D.C. Cir. 1969) (concluding that, while inquiry into an accused's financial background may be relevant in a prosecution for robbery, the prosecution must proceed gingerly in its exploration, and the trial judge should permit this inquiry only where there is a proffer that the evidence, in light of other proof, is highly probative).

█ We respect the *Davis* court's warning that this type of evidence should be admitted with caution. Therefore, while we do not substitute our judgment for that of the trial court, we do closely scrutinize the ruling, in view of the State's theory and the record as a whole.

We agree with Matthews that poor people are not more likely to steal than are people of higher income levels. However, here, the focus of the evidence was not on poverty, but rather on the fact that the lifestyle of Matthews and his family seemingly exceeded the family's income. We do not equate the prejudice of a recent bankruptcy and evidence of living beyond one's means with the prejudice of heroin addiction. Although recent bankruptcy followed by living beyond one's means may not be praiseworthy, neither is such evidence inherently so prejudicial as to outweigh its probative value in support of a rational theory of a planned but interrupted robbery. The State's presentation of this evidence was sufficiently limited so that any stigma of bankruptcy or poverty was not made a point of primary focus for the jury.

We find Matthews' citations to authority distinguishable. The passage from Wigmore regards evidence of poverty and the stigma which arises from such evidence. The evidence

introduced by the State tended to show that the Matthews were living beyond their means, not that they were destitute. As for *LeFever*, the court's concern arose both from the enormous stigma surrounding illegal drug use and from the attenuated link between LeFever's drug use and his commission of the robbery. *LeFever*, 102 Wn.2d at 784-85. In *Zipkin* the court refused to allow prior testimony, given in the course of a divorce proceeding, to establish Zipkin's financial worth, and ultimately to provide evidence of a financial motive for misappropriation of money from a bankrupt estate. The *Zipkin* court concluded that the chain of inferences was highly speculative and that the evidence of Zipkin's condition at the time of the divorce was too complex to establish a clear connection between his prior testimony and a motive for the misappropriation. *Zipkin*, 729 F.2d at 390. Here, the State's evidence, if believed, established a link between Matthews' financial condition and a motive to commit robbery.

We believe the present case is more closely akin to those cases where the admission of evidence of financial motive has been bolstered by other evidence which establishes more than the mere fact that the defendant is poor. For example, in *State v. Armstrong*, 170 Mont. 256, 552 P.2d 616 (1976), Armstrong had been convicted of deliberate homicide and robbery. The trial court admitted evi-dence showing that Armstrong had recently been fired from his job, had indicated to at least two of the witnesses that he was without money, had written checks without sufficient funds to cover them, and had been involved in a poker game on the evening in question. The *Armstrong* court, affirming the trial court, held that such evidence "taken as a whole tends to establish the fact that defendant, just prior to the crimes, was desperate for money" and that "[s]uch circumstantial evidence may provide an inference for the motive of the crimes". *Armstrong*, 170 Mont. at 263. *See also Moss v. People*, 92 Colo. 88, 93, 18 P.2d 316, 318 (1932) (testimony that the defendant gambled was admissible to show a need for money and that

he may have murdered the victim in order to rob her since he was aware that "she kept a fairly large sum of money at her house"); *Gross v. State*, 235 Md. 429, 445, 201 A.2d 808, 817 (1964) (testimony that defendant was looking for men with money was admissible in prosecution for murder, as part of a chain of evidence which tended to establish that defendant was "money conscious" and might resort to robbery to acquire things of value; State argued that defendant intended to kill then rob the victim). *Cf. United States v. Saniti*, 604 F.2d 603, 604 (9th Cir.) (per curiam) (evidence that tends to show that defendant is living beyond his means is of probative value in case involving a crime resulting in financial gain), *cert. denied*, 444 U.S. 969 (1979). Accordingly, we hold that the evidence of Matthews' financial situation at the time of the commission of the crime was relevant and produced little if any unfair prejudice in the minds of the jury.[11]

Affirmed.

A majority of this panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

WEBSTER, C.J., and BECKER, J., concur.

Review denied at 125 Wn.2d 1022 (1995).

---

[11]This ruling moots Matthews' final assignment of error, that the trial court's error in admitting this evidence was not harmless.