Hillsborough-northern judicial district
No. 2004-725

THE STATE OF NEW HAMPSHIRE

v.

UNO KIM

Argued: January 11, 2006
Opinion Issued: March 28, 2006
Opinion Modified: May 10, 2006

*Kelly A. Ayotte*, attorney general (*N. William Delker*, senior assistant attorney general, on the brief, and *Simon R. Brown*, senior assistant attorney general, on the brief and orally), for the State.

*Ted Lothstein*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

DUGGAN, J. The defendant, Uno Kim, appeals his conviction by a jury in Superior Court (*Conboy*, J.) on two counts of first-degree murder. *See* RSA 630:1-a (1996). We affirm.

The jury could have found the following relevant facts. For many years, Theodore and Gury Joseph owned "Joseph Brothers Market" in Manchester. In the early 1980's the defendant's brother bought the store

from the Joseph brothers and the defendant worked at the store for some period of time. As of February 2003, the defendant's nephew owned the store, but the Joseph brothers continued to own the building in which the store was located and remained involved in the daily operation of the business.

On the morning of February 27, 2003, the bodies of Gury and Theodore Joseph were discovered in their home in Manchester by a close friend. Gury's body was found face down on the living room floor. Theodore was found face up on a bed in an adjacent first floor bedroom. There were no signs of forced entry into the residence. Most of the rooms had been ransacked; police found file cabinet doors open and contents thrown on the floor, a hassock cut open and appliances knocked over or moved away from walls. Investigators seized an empty strong box and empty bank bags. A search for fingerprints revealed multiple impressions left by a gloved hand. The police investigation uncovered that the defendant's car had been observed at the Joseph residence the prior evening.

On February 28, 2003, the police arrested the defendant at the John F. Kennedy Airport in New York. At the time of his arrest, the defendant was waiting to board a flight to South Korea. The defendant paid for the one-way ticket with two thousand two hundred dollars cash. In the defendant's luggage and carry-on bag, police found approximately twenty thousand dollars and Ambien, a sleeping medication. The Ambien was prescribed to the defendant on February 25, 2003.

A medical examiner determined that the cause of death for both Joseph brothers was strangulation and the time of the deaths was between 10:00 p.m. on Friday, February 26, and 1:00 a.m. on February 27. A toxicology report also revealed the presence of Ambien in both brothers' bodies.

A plastic cable tie also known as a flex cuff or zip tie was wrapped around Theodore's ankle. Investigators determined that plastic cable ties, similar to the one found on Theodore's ankle, were sold by Home Depot. The police obtained a Home Depot video surveillance recording showing the defendant purchasing similar plastic cable ties two days before the murders. A fingerprint on the tie found around Theodore's ankle matched the defendant's.

After his arrest at the airport, the defendant agreed to an audiotaped interview with detectives from the Manchester Police Department. In the interview, he said that he had visited the Joseph residence on February 25, seeking a loan from Theodore in the amount of twenty thousand dollars. The defendant admitted that he needed the loan because his business had failed and he had "lost it all." He told investigators that he no longer owned his car wash business and his Mercedes was about to be repossessed for missed payments. He told investigators that his wife's

Cadillac had been repossessed that month because he did not keep up with the payments. In addition, he told police that he had a gambling problem. The defendant also said that he knew the victims kept a large amount of money in their home. According to the defendant, Theodore told him he would think about making him the loan.

The defendant told police he returned to the Joseph residence on February 26, 2003. Before arriving, the defendant crushed sleeping pills into an energy drink he planned to give the brothers in order to rob them. During his visit the defendant convinced the brothers to drink the beverages containing the pills. The defendant admitted to stealing approximately thirty-six thousand dollars after the brothers fell asleep. The defendant denied killing the Joseph brothers and tying either of them with a plastic tie. The defendant also told investigators that following the robbery he drove to the Mohegan Sun Casino in Connecticut where he gambled. He paid off gambling debts at the Mohegan Sun and Foxwoods casinos before leaving the area.

The defendant's mistress testified at trial that, after the defendant left the casinos, he met her in New Jersey. He gave her thirty-five thousand dollars in cash, slept at her apartment and left a suitcase there containing his clothing. She testified that she had met the defendant five years earlier and they became romantically involved, seeing each other once or twice a week. She testified that the defendant helped pay her mortgage, and that the defendant had run up a debt of approximately thirty-five to forty thousand dollars on her credit cards.

During the trial, the State presented evidence of the defendant's declining financial situation and lifestyle over the course of several years prior to the homicides. A certified public accountant testified that from 1997 to 2000, the defendant's yearly net income ranged between one hundred and one hundred twenty-five thousand dollars. He testified that the defendant's gambling winnings totaled at least one hundred and seventy-three thousand in 1998, and one hundred and thirty-three thousand in 1999. According to IRS submissions, the defendant's gambling losses in those years were at least equal to, if not higher than, those amounts.

In January 2001, the defendant sold his business, Uno's Car Wash. The proceeds from the sale increased his bank balances to more than three hundred thousand dollars. The defendant's cash withdrawals, credit card payments and other expenses had substantially depleted the accounts by July of that year. The defendant then sold his family home in Bedford but, by the winter of 2001-2002, had again depleted his accounts. At trial, an employee from the Mohegan Sun casino testified that the defendant's gambling losses totaled one hundred and twenty-four thousand in 2001 and

one hundred and fifty-three thousand in 2002. From January 2000 to March 2002, the defendant maintained credit card balances in the range of forty to fifty thousand dollars, but in the year leading up to February 2003 his credit card debt escalated to approximately ninety thousand dollars.

Prior to trial, the defendant filed a motion *in limine* to exclude evidence of his prior debt and financial difficulties. The trial court denied the defendant's motion. Following trial, the jury convicted the defendant of both charges. The trial court sentenced the defendant to two terms of life imprisonment without the possibility of parole. This appeal followed.

On appeal, the defendant does not challenge "the admissibility of his financial status as of the time of the crimes, including his lack of income, ninety thousand dollar credit card debt, the pending repossession of his vehicles, and his debts owed to casinos." Rather, the defendant argues that, under New Hampshire Rule of Evidence 404(b), the trial court erred in admitting into evidence "specific details of the manner in which [his] financial situation deteriorated, which included highly prejudicial minutia such as testimony that [his] gambling winnings and losses each totaled at least one hundred and seventy-three thousand dollars in 1998; ... the exact amount, one hundred and twenty-four thousand dollars, that [he] lost gambling at the Mohegan Sun in 2001; ... and the testimony that [he] took his mistress gambling at casinos in Connecticut and New Jersey, but falsely claimed to his wife that he was meeting a male friend at casinos or running a business in Ohio." The defendant argues that these specific details were irrelevant and that their impact was substantially more prejudicial than probative in the context in which they were introduced.

Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The purpose of Rule 404(b) is to ensure that the defendant is tried on the merits of the crime as charged and to prevent a conviction based upon evidence of other crimes or wrongs. *State v. Bassett*, 139 N.H. 493, 496 (1995). We have established a three-part test to assess the admissibility of evidence under Rule 404(b): (1) the evidence must be relevant for a purpose other than proving the defendant's character or disposition; (2) there must be clear proof that the defendant committed the act; and (3) the probative value of the evidence must not be substantially outweighed by its prejudice to the defendant. *State v. Smalley*, 151 N.H.

193, 196 (2004). The State bears the burden of demonstrating the admissibility of the prior bad acts. *Id.* We review the trial court's ruling for an unsustainable exercise of discretion, and will reverse only if it was clearly untenable or unreasonable to the prejudice of the defendant's case. *Id.* Here the defendant challenges the trial court's decision with respect to the first and third prongs of the Rule 404(b) analysis.

*I. Relevance*

In order to meet its burden under the first prong, the State is required to specify the purpose for which the evidence is offered and articulate the precise chain of reasoning by which the offered evidence will tend to prove or disprove an issue actually in dispute, without relying upon forbidden inferences of predisposition, character, or propensity. *Id.* To be relevant under Rule 404(b), the proffered evidence must be pertinent to an issue that is actually in dispute. *Id.* In addition, to be relevant, prior bad acts must be in some significant way connected to material events constituting the crime charged and not so remote in time as to eliminate the nexus. *State v. McGlew*, 139 N.H. 505, 507 (1995). To ensure that the relevant link between the prior bad acts and the charged conduct is not merely the defendant's bad character, there must exist a sufficient logical connection between the prior acts and his state of mind at the time of the charged conduct. *Smalley*, 151 N.H. at 197.

Here, the defendant was charged with two counts of first-degree murder, which required the State to prove that he acted purposely, with premeditation and deliberation. *See* RSA 630:1-a. The defendant had repeatedly asserted that he did not kill the victims. Rather, he claimed the victims were asleep when he left their residence. It was the State's theory that the defendant's poor financial situation prior to the homicides was relevant to prove his motive to kill the victims in connection with the robbery.

The defendant concedes that evidence of his financial situation in the month preceding the murder was admissible. He also concedes that evidence that he had substantial gambling losses and large credit card debt in the months preceding the murders was admissible. The defendant concedes that the evidence of his having a mistress in February of 2003 was relevant and admissible because he visited her and gave her money following the crimes. He argues, however, that the admission of "specific evidence of [his] behavior that, over the course of years, placed him in that situation, behaviors that many would consider immoral and wrong," was irrelevant. The State contends that evidence of the defendant's escalating gambling losses at the casinos in the years leading up to the homicide was relevant to establish how his financial condition, once healthy, plummeted

in the twelve to twenty-four months prior to the homicides. The State also argues that, "[w]hile there was other evidence of the defendant's financial problems, including the defendant's admissions, only the casino records fully and accurately demonstrated the gravity of the defendant's debt caused by gambling." The State contends that the trial court correctly admitted this evidence to establish the extent of the defendant's financial problems, as it was relevant to the defendant's motive.

Motive has been defined as supplying the reason that nudges the will and prods the mind to indulge in criminal intent. *State v. Monroe*, 142 N.H. 857, 872 (1998). In light of the defendant's admission that he stole approximately thirty-six thousand dollars from the Joseph brothers, his extensive gambling debts and financial support of his mistress, we conclude that the evidence to which the defendant objects was relevant to show his motive to kill the Joseph brothers. After the defendant sold his business and properties in 2001, his income evaporated. As his bank balances declined and his credit card balances and casino losses soared in 2001 and 2002, the defendant was no longer in a position to absorb the debt. Thus, the evidence of the gambling losses was not too remote and was directly relevant to establish that the defendant had become financially pressured enough to rob and murder the victims. In addition, his mistress's testimony regarding the defendant's extramarital activities was highly relevant to show that the defendant incurred large debts even beyond those reflected on his own credit cards.

In *State v. Matthews*, 877 P.2d 252 (Wash. Ct. App. 1994), the court considered whether evidence of a defendant's declining financial situation was relevant to prove a motive for murder of a robbery victim. *Id.* at 256. The defendant in *Matthews* was accused of murdering the owner of a jewelry store. *Id.* at 253. The State sought to introduce evidence that the defendant had been living beyond his means and recently declared bankruptcy to demonstrate the victim's murder was the result of an interrupted robbery by the defendant. *Id. Matthews* held that admission of the defendant's financial information was not an abuse of discretion, stating: "Living beyond one's means could reasonably provide a motive for robbery, which in turn could reasonably provide a motive for murder of the robbery victim." *Id.* We find compelling the reasoning of the *Matthews* court:

> The human mind searches for a rational explanation for an irrational act of murder of a shopkeeper in his store in a shopping mall at high noon on a seemingly normal working day. Robbery, and a desire to leave no witness, is the most rational explanation for such an event. In these circumstances, whether the accused

person had any motive for robbery becomes a relevant subject for inquiry; if not, the likelihood of that person being the assailant is rationally reduced. Notwithstanding that motive is not an element of the crime of murder, it is still a permissible area of inquiry.

*Id.*

Here, the defendant had been under financial pressure for several years. The trial court articulated the precise chain of reasoning by which evidence of the defendant's financial problems would establish such a motive:

[T]here is a sufficient logical connection between [the defendant's] declining financial situation and his motive to rob and kill the victims. Evidence of the defendant's debt and financial difficulties establish a motive for [the defendant] to not only rob the Joseph brothers but also to kill them in order to eliminate any potential witnesses. The defendant's dire financial position has further relevance in assessing the motive to kill witnesses to the robbery when viewed in light of his failed attempt to obtain a [twenty thousand dollar] loan from Theodore Joseph immediately prior to the homicides.

The defendant argues that the relevance of specific details concerning his excessive gambling was eliminated by his admission to police that he drugged and robbed the victims due to financial desperation. We disagree. Despite the defendant's admissions to robbing the Josephs, the defendant's motive and his identity as the killer remained in serious dispute at trial. The defendant argued at trial that the Josephs were alive when he left. By pursuing this defense at trial, the defendant placed at issue his identity as the perpetrator and his motive. *Cf. State v. Glodgett*, 144 N.H. 687, 694 (2000). Since his identity was contested, the full extent of the defendant's grave financial picture and extramarital affair was relevant to demonstrate that he, a financially pressured man, and not some other perpetrator, committed the killings. *See People v. Zack*, 229 Cal. Rptr. 317, 319 (Ct. App. 1986) ("Evidence having a direct tendency, in view of the surrounding circumstances, to prove motive on the part of a person for a crime, and thus to solve a doubt, . . . as to the identity of the slayer . . . is admissible against a defendant, however discreditably it may reflect on him, and even where it may show him guilty of other crimes." (quotation omitted)).

■ We conclude that there is a sufficient logical connection between the defendant's state of mind on the night of the homicides and his financial

decline, due to his gambling losses over the years and his lengthy extramarital affair. Thus, the trial court did not err in ruling that the challenged evidence was relevant to the defendant's state of mind and, therefore, it was properly admitted for purposes other than bad character and propensity under Rule 404(b).

## II. Prejudice v. Probative Value

■ The defendant next argues that the trial court erred in its analysis under the third prong of Rule 404(b). Under this prong, evidence of prior bad acts is admissible if the danger of unfair prejudice to the defendant does not substantially outweigh the probative value of the evidence. *Smalley*, 151 N.H. at 198. Among the factors to consider under this prong are: (1) whether the evidence would have a great emotional impact upon a jury; (2) its potential for appealing to a juror's sense of resentment or outrage; and (3) the extent to which the issue upon which it is offered is established by other evidence, stipulation, or inference. *Id.* We accord considerable deference to the trial court's determination in balancing prejudice and probative worth under Rule 404(b). *Id.* To prevail, the defendant must show that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case. *Id.*

■ First, we consider the probative value of the evidence. *Id.* at 199. As set forth above, evidence of the defendant's financial decline was relevant to prove his motive to commit the murders and leave no witnesses to the theft. We acknowledge that our evaluation of the probative value of the evidence overlaps with our prior relevancy determination. We note, however, that although evidence may be relevant, it may have minimal probative value. *Id.* Here, evidence that over the several years preceding February 2003 the defendant lived lavishly, engaged in gambling activities during his extramarital affair and experienced dire financial circumstances was highly probative. Further, the issue of the defendant's motive was a centrally disputed issue in the case. This evidence was highly probative of the defendant's motive for visiting the Joseph brothers' home to rob and murder them, and eliminate all witnesses, in order to protect himself from financial ruin.

Next, we consider whether the prejudice to the defendant substantially outweighed the probative value of the evidence. The defendant argues that, even if the details of his gambling and extramarital affair were relevant, their introduction was unduly prejudicial.

We recognize that the introduction of the defendant's desperate financial status is inherently prejudicial. Cases allowing evidence of a defendant's strained financial circumstances as a possible motive for a

crime point out that this may put indigent defendants at a disadvantage as compared to the more affluent. *See, e.g., People v. Andrews*, 276 N.W. 2d 867, 868 (Mich. Ct. App. 1979). However, as the trial court aptly noted, "inherent prejudice does not ipso facto render such evidence inadmissible." When evidence presents a potential for prejudice, such evidence must possess significantly greater probative value. *Smalley*, 151 N.H. at 200.

█ Courts have noted that while evidence of a prior offense or bad act is always prejudicial, the prejudice is frequently outweighed by the probative value of the evidence when the defendant's knowledge or intent is a contested issue in the case. *Id.* As noted above, the challenged evidence presented proof of the defendant's motive to not only rob, but also murder the Joseph brothers, a central issue in the case. Thus, in this case, the probative value of the evidence is not substantially outweighed by any unfair prejudice.

In *Matthews*, discussed above, the court also considered whether the probative value of evidence with respect to a defendant's financial circumstances was substantially outweighed by its prejudice. *Matthews*, 877 P.2d at 284. The *Matthews* court distinguished evidence focused solely on poverty from evidence reflecting a changed financial condition, noting that, "[a]lthough recent bankruptcy followed by living beyond one's means may not be praiseworthy, neither is such evidence inherently so prejudicial as to outweigh its probative value . . . ." *Id.* at 286.

Here, as in *Matthews*, the focus of the evidence was not the defendant's poverty but rather the fact that the defendant's lifestyle had driven him to financial ruin. While the defendant argues financial irresponsibility, resulting in part from having a mistress and gambling, are the types of acts that will appeal to a juror's outrage, such evidence is not the sort of evidence that would arouse the emotions of a jury and cause it to decide the case on emotion rather than the evidence. *See State v. Lamprey*, 149 N.H. 364, 370 (2003). Furthermore, while debt from legal gambling and having a mistress have a potential for prejudice, we do not find evidence of this nature so inherently prejudicial as to outweigh its probative value. *See, e.g., State v. Gruber*, 132 N.H. 83, 89-90 (1989).

Moreover, none of the 404(b) evidence was similar to the crime of first-degree murder. "Unfair prejudice is inherent in evidence of other similar crimes or prior convictions." *Smalley*, 151 N.H. at 200 (quotation omitted). The degree of prejudice inherent in a reference to another bad act may depend upon the similarity of the other incident to that for which the defendant is currently on trial. *Id.* Here, as the trial court aptly noted, "The defendant's financial irresponsibility is not similar to murder or violent in nature."

Finally, the issue of the defendant's financial crisis was already "established by other evidence, stipulation, or inference." *Id.* For instance, as noted above, the defendant does not challenge the admissibility of his financial status as of the time of the crimes, including his lack of income, debt to various creditors and repossession of his vehicles. He concedes the relevance of this evidence to the issue of his "motive to commit theft and to evade detection by eliminating witnesses, as the trial court found." Thus, the evidence the defendant is challenging is largely cumulative of other evidence properly introduced. *See id.* at 199.

 Because the probative value of the challenged evidence was not substantially outweighed by the danger of unfair prejudice to the defendant, we conclude that the trial court's ruling was not clearly untenable or unreasonable to the prejudice of the defendant's case.

*Affirmed.*

DALIANIS and GALWAY, JJ., concurred.