# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

STATE OF WASHINGTON,

                Respondent,

     v.

MICHAEL WILLIAM BIENHOFF,

                Appellant.

No. 74519-1-I

ORDER WITHDRAWING OPINION
AND SUBSTITUTING OPINION

The court has determined that the opinion filed on June 11, 2018, should

be withdrawn and a substitute opinion be filed. Now, therefore, it is hereby

ORDERED that the opinion filed on June 11, 2018, be withdrawn and a

substitute opinion be filed.

FOR THE COURT:

_____
Trickey, J

_____

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON
2018 AUG 27 AM 11: 37

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON, )
                       )
      Respondent, )
                       )
      v. )
                       )
MICHAEL WILLIAM BIENHOFF,† )
                       )
      Appellant. )

No. 74519-1-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: August 27, 2018

TRICKEY, J. — Michael Bienhoff and Karl Pierce claimed that they were involved in a marijuana deal with Precious Reed and Demetrius Bibb. During the transaction, an altercation occurred between Bienhoff and Reed. A handgun discharged and killed Reed.

The State ultimately charged codefendants Bienhoff and Pierce with first degree felony murder predicated on robbery in the first degree, with a deadly weapon allegation. The State's theory at trial was that Bienhoff and Pierce intended to rob Reed, rather than to sell him marijuana. The jury convicted Bienhoff as charged. Because the prosecutor committed misconduct during voir dire that prejudiced Bienhoff, we reverse Bienhoff's conviction and remand for a new trial.

---

† Michael Bienhoff and Karl Pierce were tried as codefendants in the trial court. In this court, the appeals were linked for hearing but not consolidated. For clarity, we have written two opinions and revised each case caption to refer only to the appellant in each appeal.

FACTS

Reed and Bienhoff had known each other for several years. In February 2012, Reed asked Bienhoff to sell him a couple of pounds of marijuana. On February 20, 2012, Bienhoff told Reed that he would sell Reed two pounds of marijuana for $2,200 per pound. Reed replied that he still wanted the marijuana but needed to raise money. Bienhoff claimed that he picked up two and a half pounds of marijuana from his supplier for $1,800 per pound.

Bienhoff planned to meet Reed near Green Lake, an area of North Seattle, to conduct the transaction. Bienhoff went to Ramon Lyons's home in the Bitter Lake community. Lyons helped Bienhoff arrange for Scott Barnes to provide a ride.

When Barnes arrived at Lyons's home, Lyons was on the front porch cleaning a revolver. After meeting with Barnes, Bienhoff asked Lyons to accompany them as "insurance."[1] Lyons agreed, and the group went to pick up Lyons's friend, Pierce. Bienhoff and Pierce had not previously met. Bienhoff claimed to have separated the two pounds of marijuana he planned to sell to Reed and the extra half pound into two backpacks.[2]

Barnes drove the group back to Lyons's house. Lyons testified that Bienhoff said that he did not feel safe and asked to borrow a gun. Lyons and Pierce got out of the car, and Lyons entered the house. Lyons retrieved two handguns. One was a gray or chrome colored .45 caliber semiautomatic pistol. The other was the

---

[1] Report of Proceedings (RP) (Oct. 27, 2015) at 3435.
[2] Barnes testified that the group went directly from Pierce's home to Green Lake without making any stops.

2

revolver Lyons had been cleaning earlier. After Lyons and Pierce returned to the car, Barnes drove the group toward Green Lake.

While en route, Lyons gave the revolver to Bienhoff.[3] When the group stopped at a gas station, Bienhoff and Barnes left the car. While alone in the car, Lyons warned Pierce to watch Bienhoff, and gave him the semiautomatic pistol.[4]

After leaving the gas station, Barnes drove to Green Lake. He parked the car near the lake in an upper parking lot of Woodland Park. Bienhoff got out of the car. He hid the backpack in a bush. After asking Barnes to move the car away from the lot, Bienhoff asked Lyons to stay out of sight but within earshot of where Bienhoff was going to meet Reed. Lyons told Pierce to "back up" Bienhoff to ensure that he was not robbed.[5]

Reed arrived driving a gray van. A white Cadillac followed Reed's van into the parking lot. Reed parked, and the white Cadillac stopped further down the lot. Pierce was outside of Barnes's car. He found a vantage point from which he could see Reed's van and the white Cadillac. Pierce observed that Reed and the driver of the Cadillac were both black males.

Reed and the driver of the Cadillac, later identified as Bibb, exited their vehicles and greeted Bienhoff. Bibb had agreed to pay half the cost of the

---

[3] At trial, Bienhoff denied asking Lyons for a weapon and that he knew that Lyons and Pierce were armed. Pierce testified that he did not see any other members of the group carrying guns, and that he did not think Bienhoff was armed. But Barnes testified that he observed Lyons handing the revolver to Bienhoff and that he noticed that Pierce was armed.

[4] Lyons testified that he gave the .45 caliber handgun to Pierce while the entire group was in the car and driving toward Green Lake from the gas station.

[5] RP (Oct. 22, 2015) at 3250.

3

marijuana, and thought the deal was $2,000 for two pounds. Bibb planned to "front" the marijuana, or pay part of the purchase price at the transaction, sell some of the purchased marijuana, and then pay the seller the outstanding balance.[6] Bibb denied having a gun that day, and he did not think that Reed was armed.

Bienhoff recovered the backpack and Bibb returned to the Cadillac. Reed got into the van and sat in the driver's seat. Bienhoff also entered the van and sat in the front passenger's seat. Bienhoff claimed that he showed Reed the marijuana. Reed told Bienhoff that he did not have the full amount of money to buy the marijuana. Reed asked Bienhoff to front the marijuana, but Bienhoff declined.

Bienhoff testified that he began to exit Reed's van. He claimed that he saw Reed reaching to his left for the butt of a handgun. He claimed that he and Reed wrestled for the handgun. The handgun, a revolver with a 10-inch barrel, discharged into Reed's shoulder. The bullet travelled upwards into Reed's brain and caused his death.

The shot temporarily deafened Bienhoff. He grabbed the backpack, exited Reed's van, and ran to Barnes's car. While running, Bienhoff saw Bibb standing between Reed's van and the Cadillac. He did not notice whether Bibb was armed or had fired any shots.

Pierce had seen Reed's van start to rock and assumed there was a struggle. Pierce moved closer to the van. Bienhoff ran past Pierce, who heard Bienhoff say that Reed had attempted to rob him. Pierce saw a black male come around the

---

[6] RP (Oct. 1, 2015) at 1702.

4

front of Reed's van, and heard a boom. Pierce thought the man was shooting at him. He ran toward Barnes's car without drawing his gun.

Lyons had initially moved toward the lake but had begun to head back to the upper parking lot. On his way, he heard gunfire and "hit the ground."[7] Once he got up, he saw Pierce running toward the parking lot without a gun in his hand. Lyons heard multiple gunshots. He ran back toward Barnes's car, and heard tires squeal after the gunfire ended.

Barnes remained in his car. Barnes heard five gunshots in rapid succession and thought he could hear them striking metal.

Bibb testified that he remained in the Cadillac. He observed Reed's van while Reed and Bienhoff were inside. Bibb did not hear raised voices, see a struggle, or hear a gunshot.

Bibb saw another individual, who he later described as 5 feet 8 inches tall or 5 feet 9 inches tall, run between the Cadillac and the van, turn towards Bibb, and began firing at him with a dark-colored gun. Bibb ducked down, put his car in gear, and rapidly left the parking lot. Bibb heard and felt bullets strike the Cadillac. He later found bullet holes in its side.

There were two eyewitnesses who observed the incident. The first, Earl Cadaret, watched through the kitchen window of his recreation vehicle, which was parked in the same lot as Reed's van and Bibb's Cadillac. Cadaret observed two black males, one of whom was substantially taller than the other, walking toward the van and the Cadillac.

---

[7] RP (Oct. 15, 2015) at 2566.

5

Cadaret saw the taller man enter the driver's side of the Cadillac. He later noticed the same man standing outside of the Cadillac looking at the van, and then saw him in front of the van with his arm extended. Cadaret heard several loud noises that may have been "bangs, pops, or rattle[s]."[8]

Cadaret saw the Cadillac drive away, and did not see anyone shooting at it. He watched the shorter man fall out of the van. After the Cadillac was gone, Cadaret went to the man on the ground and called 911. When the police interviewed him later, Cadaret stated that the man in the Cadillac looked like he had a gun and had shot the man in the other car.

The second eyewitness was Mark Howard. He was sitting in his truck, which was in the parking lot where the incident occurred. He saw a minivan and light-colored sedan park in the lot. He viewed two black males and one white male standing in the lot before the white man retrieved a backpack from some bushes.

Howard watched the two black males head toward the minivan and the sedan. Shortly thereafter, Howard heard "popping" sounds.[9] He saw a man he later identified as Pierce running and holding a silver-colored automatic gun.[10]

Howard thought Pierce was shooting at the minivan and the sedan, although he did not see any muzzle flashes or discharged shell casings. Howard testified that he might have seen another armed man behind the shooter. Howard fled the parking lot in his truck. He returned later to give police a recorded statement after he saw a report of the incident on the news.

---

[8] RP (Sept. 30, 2015) at 1433.
[9] RP (Sept. 30, 2015) at 1531.
[10] Pierce stated in cross-examination that he was the man seen by Howard.

6

Once Bienhoff, Pierce, Lyons, and Barnes were in Barnes's car, Pierce said that he thought the driver of the Cadillac had shot at them. Barnes testified that Pierce told the group that he saw Reed "slumped" in the van.[11] Barnes also testified that Pierce said that he had been "'busting at the caddy'" and that he would dispose of the weapons.[12] Barnes testified that Lyons said, "'Nobody say anything, or we're all screwed.'"[13]

Pierce testified that he put the gun Lyons had given him on the floor of Barnes's car. Lyons did not see any guns in Barnes's car after the incident. Bienhoff later claimed that he gave the marijuana to someone he knew.

Police officers found Reed face down on the ground next to his van. The van's doors were open. Reed had approximately $1,200 in cash on his person, and no gun was found at the scene. Several .45 caliber shell casings were found in the parking lot. A crime laboratory concluded that a .38 caliber gun and a .45 caliber gun had been discharged during the incident.

While watching the news that night, Pierce heard that someone had been shot at Green Lake, and went into hiding for about a month. Bibb learned that Reed had died later that evening or early the next morning. When police interviewed Bibb the next day, he gave them permission to confiscate the Cadillac. When Bibb was shown photomontages, he identified Bienhoff and tentatively identified Pierce as the person who had shot at him.[14]

---

[11] RP (Oct. 12, 2015) at 2138.
[12] RP (Oct. 12, 2015) at 2138. Pierce denied that he had disposed of or destroyed any guns or cell phones linked to the incident.
[13] RP (Oct. 12, 2015) at 2138.
[14] Bibb identified Pierce's photograph as the one who "most closely resembled" the person who shot at him.

The police arrested Bienhoff about one week after the incident. The State charged Bienhoff and Pierce by amended information with murder in the first degree by reason of causing Reed's death while committing or attempting to commit the crime of robbery in the first degree. The charge included a deadly weapon allegation. The State also charged Lyons and Barnes as codefendants with Bienhoff and Pierce, but they pleaded guilty to lesser charges in exchange for their testimony at trial.

At trial, the State's theory was that Bienhoff did not bring marijuana to the meeting with Reed, and intended to rob Reed of the purchase money. The State contended that Pierce was the second shooter. Bienhoff denied that the group discussed a robbery. Bienhoff testified that he only discussed guns with Pierce, Lyons, and Barnes to say that someone had shot at them.

The jury convicted Bienhoff as charged, and he appeals.[15]

## ANALYSIS

### Trial Court Discussion of Capital Punishment

Bienhoff argues that the trial court erred during voir dire by instructing the jury that the death penalty was not at issue in the present case. Because the trial court did not say whether or not the case was noncapital and correctly informed the jury of their role, we disagree.

"The question of the sentence to be imposed by the court is never a proper issue for the jury's deliberation, except in capital cases." State v. Bowman, 57 Wn.2d 266, 271, 356 P.2d 999 (1960). "This strict prohibition against informing

---

[15] Additional facts will be included as appropriate in sections of the analysis.

the jury of sentencing considerations ensures impartial juries and prevents unfair influence on a jury's deliberations." State v. Townsend, 142 Wn.2d 838, 846, 15 P.3d 145 (2001).

"[I]t is error to inform the jury during voir dire in a noncapital case that the death penalty is not involved." State v. Hicks, 163 Wn.2d 477, 487, 181 P.3d 831 (2008) (citing Townsend, 142 Wn.2d at 840)). There is no "distinction between a court or counsel-initiated and a juror-initiated discussion of the inapplicability of the death penalty." Hicks, 163 Wn.2d at 487 (2008) (citing State v. Mason, 160 Wn.2d 910, 929, 162 P.3d 396 (2007)). "[I]n response to any mention of capital punishment, the trial judge should state generally that the jury is not to consider sentencing." Hicks, 163 Wn.2d at 487.[16]

Here, during voir dire, the State informed the jury that they would have no role in deciding the defendants' punishment. When a juror asked whether Washington used the death penalty, the trial court informed the jury that the Washington Supreme Court prohibited it from telling the jury whether the death penalty was involved in the case. Several jurors expressed concerns about the death penalty. They were informed that sentencing was the trial court's responsibility and that the jury was only involved in the determination of guilt. One juror stated that they had an understanding of the process of imposing the death penalty in Washington.

---

[16] The State argues that Townsend was incorrectly decided and should be overruled. This court is bound by Washington Supreme Court precedent and does not have the authority to overrule its decisions. State v. Jussila, 197 Wn. App. 908, 931, 392 P.3d 1108 (2017). Further, Townsend has been favorably cited in subsequent cases examining this issue. See Hicks, 163 Wn.2d at 487-89. We reject the State's request to overrule Townsend.

Bienhoff objected to the State's discussion with the jury about the death penalty and moved for a mistrial. The trial court denied the motion, noting that the discussion with the jury was not improper and that the State had not told the jury whether the death penalty was involved. Bienhoff agreed that the trial court gave the jury an accurate description of their role. Prior to dismissing the jurors for the day, the trial court reiterated that they would not be informed that this was a capital case, and told them, "[h]owever, if it is, the question of whether the death penalty would be imposed is a separate proceeding at which there could be additional evidence and would be determined by a jury that follows the trial and any conviction."[17]

The trial court's statements to the jury regarding the death penalty were not improper. The trial court explicitly noted that Washington Supreme Court precedent prevented it from informing the jury whether or not the death penalty was involved. In accordance with Hicks, the trial court informed the jury that they would determine whether Bienhoff was guilty, but not his sentence if he was convicted.

This discussion does not rise to the level of informing the jury that the death penalty was not at issue in the present case. Although a juror mentioned that they knew about Washington's death penalty process, the trial court addressed any

---

[17] RP (Sept. 23, 2015) at 887. Bienhoff argues that the trial court erred when it failed to instruct the jury that they would not have anything to do with punishment, in accordance with *Washington Pattern Jury Instruction* 1.02. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 1.02, at 21 (4th ed. 2016) (WPIC). The WPICs are not binding on trial courts. WPIC 0.10, at 3-4. Bienhoff does not cite additional authority demonstrating that the cited provision has been adopted as a required instruction. We reject this argument.

issue when it told the jury about Washington's bifurcated proceeding for applying the death penalty. Further, the trial court reemphasized that this jury's role would be to determine whether Bienhoff was guilty. Therefore, we conclude that the trial court did not err because it did not inform the jury whether the death penalty was at issue in the present case and accurately described the jury's role.

### Prosecutorial Misconduct During Voir Dire

During voir dire, the prosecutor discussed the death penalty with potential jurors. Bienhoff objected, stating,

> Your Honor, I have a very, very strenuous objection to the proceeding that we have, and I'm afraid I have to ask for a mistrial. I believe that what's [sic] - - we have seen right here is the State attempting to death-qualify a panel where the death penalty is not on the table, and that's completely inappropriate.[18]

Pierce joined in the objection and the motion. The trial court ruled that the questioning was not improper.

The trial court supervises voir dire, and "'a great deal must, of necessity, be left to its sound discretion.'" State v. Davis, 141 Wn.2d 798, 825, 10 P.3d 977 (2000) (internal quotation marks omitted) (quoting Ristaino v. Ross, 424 U.S. 589, 594-95, 96 S. Ct. 1017, 47 L. Ed. 2d 258 (1976)). "Where prosecutorial misconduct is claimed, the defense bears the burden of establishing the impropriety of the prosecuting attorney's comments and their prejudicial effect." State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997). "To establish prejudice, the defense must demonstrate there is a substantial likelihood the misconduct affected the jury's verdict." Brown, 132 Wn.2d at 561. Thus, "[a]llegations of prosecutorial

---

[18] RP (Sept. 23, 2015) at 838.

misconduct are reviewed under an abuse of discretion standard." State v. Brett, 126 Wn.2d 136, 174-75, 892 P.2d 29 (1995) (citing State v. Hughes, 106 Wn.2d 176, 195, 721 P.2d 902 (1986)).

To ensure that the jury remains impartial and is not unduly influenced, the jury may not be informed of the sentence to be imposed by the trial court, except in capital cases. Townsend, 142 Wn.2d at 846; Bowman, 57 Wn.2d at 271. Thus, the jury may not be informed that the death penalty is not involved during voir dire in a noncapital case. Hicks, 163 Wn.2d at 487 (citing Townsend, 142 Wn.2d at 840).

Here, jury selection occurred over four days. The trial court informed each group of prospective jurors that the State had charged Pierce and Bienhoff with murder in the first degree.

During the first day of voir dire, the prosecutor asked the trial court outside of the presence of any potential jurors "how the Court [would] address the jury if anybody ask[ed] the question of whether or not this [was] a death penalty case."[19] The trial court's response was that, when the question had been raised in the past, it "sort of evaded the question." The trial court added that, when it came up again, it addressed each juror who had a concern individually.[20] The trial court also said it could address the potential jurors as a whole if counsel wanted it to do so.

The prosecutor responded that

> [t]he State's preference is to address it head on, of course, in accordance with the law, which is to instruct them that our state Supreme Court has decided that that is not something that they are privy to, or we cannot tell them if this is a death penalty case or not,

---

[19] RP (Sept. 21, 2015) at 405.
[20] RP (Sept. 21, 2015) at 406.

and then ask them the follow-up question. Basically, not knowing whether this is a death penalty case or not, does that cause you concern as to whether or not you could be a fair and/or impartial juror is this case.[21]

The trial court replied that

[m]y preference would be not to ask the follow-up question, but just tell them that and then go on and see if any of them raises the issue beyond that. But I don't know what you think about that.

The problem is if I invite them to say, you know, can you be fair and impartial, then anybody who for some reason or other couldn't like the idea of being here has a good way to head for the door.[22]

The prosecutor then stated that if the trial court "leaves it as that sort of pregnant issue before the jury, I will ask that follow-up question or I intend on asking the follow-up question, because that obviously would be a concern for, I think, both parties."[23] Counsel for Bienhoff agreed. The trial court concluded the discussion by stating, "It's probably less of a concern if you ask the question than if I ask the question."[24] The prosecutor said he would defer to the trial court.

On the morning of the third day of jury selection, the trial court dismissed Juror 56 because his conscience would bother him if he voted to convict a person who after spending years in prison was found to be innocent. In the afternoon that day, during the third round of attorney questioning, the prosecutor referred to Juror 56's being dismissed because of the "weight of being a juror.[25]" He informed the potential jurors that the jury was tasked with determining the guilt or innocence of

[21] RP (Sept. 21, 2015) at 406.
[22] RP (Sept. 21, 2015) at 406.
[23] RP (Sept. 21, 2015) at 407.
[24] RP (Sept. 21, 2015) at 407.
[25] RP (Sept. 23, 2015) at 824.

Pierce and Bienhoff, and would have no role in deciding their punishment. No prospective juror had expressed concerns about the death penalty at that point.

The prosecutor then said,

> . . . Does that make sense? Do you guys all understand that? Everyone is nodding their head.
>
> Are you okay with it? Everybody in the jury box seems to be nodding their head.
>
> Anybody have a concern about that or think that doesn't make sense? Anybody? No one?
>
> What about over here? Everyone okay with that? Does that cause you any concern about being a juror in this case where the charge is murder in the first degree? Anybody?[26]

In response to the prosecutor's repeated questions and reminder of the charge against Pierce and Bienhoff, a juror asked whether Washington State used the death penalty. The prosecutor deferred to the trial court, who told the potential jurors that it could not tell them whether or not the death penalty was involved in the present case. The prosecutor then responded to several juror questions regarding the death penalty.[27]

The trial court then excused the jury to consider the defense objection to the State's effort to "death-qualify a jury on a non-death penalty case."[28] The trial

---

[26] RP (Sept. 23, 2015) at 825.
[27] For example, several jurors expressed concerns about being involved in a case where the death penalty could be imposed, and discomfort about not knowing whether the death penalty was at issue. One juror implied that they knew the process by which the death penalty is imposed in Washington. The prosecutor generally responded to the jurors' questions by stating that he and the trial court could not tell the jurors whether the death penalty was at issue, and asking each juror if they could still be impartial.
[28] RP (Sept. 23, 2015) at 839.

court disagreed that the State was "death-qualify[ing]" the jury.[29] The trial court said the State "pivoted off" Juror 56's concerns about "sitting in judgment" and was only asking if any juror had a "problem not being involved in the penalty."[30] The defense responded that the State's extensive and "invitational" questioning prompted the discussion of the death penalty.[31] The trial court ruled that the State's questioning was not improper and expressed surprise that the topic had not come up earlier in jury selection since the charge was murder in the first degree.[32]

We conclude that the prosecutor's repeated questioning of the potential jurors prior to the discussion of the death penalty constituted prosecutorial misconduct, and that the trial court abused its discretion in failing to curtail the prosecutor's line of questioning.[33]

The record reveals that the potential jurors indicated that they understood the prosecutor's description of the jury's role and did not have follow up questions. But the prosecutor nonetheless elicited a discussion of the death penalty through

---

[29] RP (Sept. 23, 2015) at 839.
[30] RP (Sept. 23, 2015) at 839.
[31] RP (Sept. 23, 2015) at 845.
[32] RP (Sept. 23, 2015) at 846.
[33] Pierce and Bienhoff were joined for trial as codefendants. On appeal their cases were linked but not consolidated. On June 11, 2018, we affirmed Bienhoff' conviction and reversed Pierce's conviction in two separate opinions. On June 25, 2018, Bienhoff filed a motion to reconsider this court's opinion. Bienhoff acknowledged that he failed to raise this argument on appeal and requests that this court grant him the same relief accorded to Pierce under Rules of Appellate Procedure (RAP) 1.2(a) and RAP 12.1(a).

The RAPs "will be liberally interpreted to promote justice and facilitate the decision of cases on the merits." RAP 1.2(a). Generally, "the appellate court will decide a case only on the basis of issues set forth by the parties in their briefs." RAP 12.1(a).

Because the prejudicial error during voir dire affected both Bienhoff and Pierce and Bienhoff raised the objection to the prosecutor's conduct below, we grant Bienhoff's motion to reconsider and accord him the same relief accorded to Pierce in the interest of justice under RAP 1.2(a).

his repeated questioning of the jury's understanding and recitation of the charges against Pierce and Bienhoff. He did so despite being aware of the Washington Supreme Court's position that the jury must not be told whether the death penalty is possible in any given case. Therefore, the prosecutor's elicitation of a discussion on the death penalty constituted improper conduct sufficient to support a claim of prosecutorial misconduct.

Further, there is a substantial likelihood that the prosecutor's improper comments prejudiced Pierce and Bienhoff. During the discussion of the death penalty, Juror 6 expressed concern over taking part in a decision that led to the imposition of either the death penalty or a life sentence. Although Juror 6 initially said that she could remain impartial, she later stated that she would be unable to render a decision while "not knowing whether or not [the death penalty is] even a possibility."[34] The State moved to strike Juror 6 for cause based on her responses, which the trial court denied. But the trial court allowed the State to exercise a preemptory challenge against Juror 6 in part because of her responses during the death penalty discussion.

Juror 76 was also dismissed based on her response to the improper discussion about the death penalty. After several jurors had asked questions about the death penalty, Juror 76 said, "I think just sitting here, I didn't realize that - - I don't know if I could make that decision for people. I really get so nervous. I couldn't even eat what I brought for lunch. I can't decide."[35] The prosecutor asked Juror 76, "Are you saying having heard all of this that you wouldn't be able to fairly

---

[34] RP (Sept. 23, 2015) at 833.
[35] RP (Sept. 23, 2015) at 837.

16

take in all the evidence and follow the law and make the decision that's being asked of you?"[36] In response, Juror 76 said, "I don't think so."[37]

In discussing Juror 76's fitness to serve as a juror, the trial court noted that Juror 76 had expressed discomfort with the proceedings prior to the discussion of the death penalty. Counsel for Bienhoff pointed out that Juror 76 had a personal hardship that may have affected her mental state.[38] But the State specifically argued that, Juror 76 "indicated that she cannot take in the evidence and follow the Court's instructions and deliberate with her fellow jurors. So because of that, the State believes it's appropriate to strike . . . Juror Number 76 for cause."[39]

Ultimately, the trial court dismissed Juror 76, stating that, "I am not dismissing 76 on the grounds of hardship. I am dismissing 76 on the grounds that she is emotionally unable to be a juror in this case."[40]

A review of the record reveals that Juror 76 was dismissed based on her response to the improper discussion of the death penalty. The trial court's statement that Juror 76 was emotionally disturbed prior to the discussion of the death penalty was based on Juror 76's statement *after* the discussion had taken place. The record does not show that the trial court was considering dismissing Juror 76 as emotionally unfit to serve as a juror until after the discussion of the death penalty, and the trial court specifically stated that it was not dismissing Juror 76 on her personal hardship ground.

---

[36] RP (Sept. 23, 2015) at 837.
[37] RP (Sept. 23, 2015) at 837.
[38] RP (Sept. 23, 2015) at 848-49, 857-59.
[39] RP (Sept. 23, 2015) at 848.
[40] RP (Sept. 23, 2015) at 858.

Therefore, two potential jurors were dismissed based on their responses to the discussion of the death penalty elicited by the prosecutor's improper conduct. The improper changing of the composition of the jury in favor of those who were comfortable with the possibility of the death penalty being imposed is highly likely to have rendered the jury more inclined to convict and punish. Thus, there is a substantial likelihood that the prosecutor's improper comments prejudiced Pierce and Bienhoff.

In sum, the prosecutor's extensive questioning was improper because it elicited a discussion of the death penalty during voir dire in this noncapital case. Further, there is a substantial likelihood that the improper comments prejudiced Pierce and Bienhoff because potential jurors that may have otherwise sat on the jury were struck on the basis of their negative responses to the death penalty discussion. Thus, we conclude that the trial court abused its discretion when it failed to curtail this line of questioning during voir dire, and remand for a new trial.

## Appearance of Fairness Doctrine

Bienhoff argues that the trial judge violated the appearance of fairness doctrine when he made a comment implying racial bias.[41] But Bienhoff did not object to the trial judge's comment below. "An appearance of fairness claim is not

---

[41] When examining the admissibility of text messages sent between Reed and a third party regarding a debt Reed owed, the judge stated, "[W]e don't have any information [about the third party], so we don't know whether he's some white guy like me making a threat or somebody who's actually, you know, more likely to be a gangster." RP (Oct. 21, 2015) at 2915. The Commission on Judicial Conduct subsequently admonished the judge. Commission on Judicial Conduct, Judicial Conduct Commission Approves Stipulation and Admonishes Judge Douglass A. North, No. 8583-F-174 (Dec. 8, 2018), https://www.cjc.state.wa.us/materials/activity/public_actions/2017/8583FinalStip.pdf (last visited May 11, 2018).

'constitutional' in nature under RAP 2.5(a)(3) and, thus, may not be raised for the first time on appeal." In re Guardianship of Cobb, 172 Wn. App. 393, 404, 292 P.3d 772 (2012) (quoting State v. Morgensen, 148 Wn. App. 81, 90-91, 197 P.3d 715 (2008)); see also City of Bellevue v. King County Boundary Review Bd., 90 Wn.2d 856, 863, 586 P.2d 470 (1978) ("Our appearance of fairness doctrine, though related to concerns dealing with due process considerations, is not constitutionally based."). Therefore, we conclude that Bienhoff cannot raise this issue for the first time on appeal.

Because the other issues Bienhoff raises may occur on retrial, we address them in the remainder of this opinion.

### Exclusion of Evidence

Bienhoff argues that the trial court abused its discretion when it refused to admit several pieces of evidence.[42] We examine each piece of offered evidence in turn.

Evidence that is not relevant is not admissible. ER 402. "[E]vidence must (1) tend to prove or disprove the existence of a fact, and (2) that fact must be of consequence to the outcome of the case." Davidson v. Municipality of Metro. Seattle, 43 Wn. App. 569, 573, 719 P.2d 569 (1986); ER 401. This includes "facts which offer direct or circumstantial evidence of any element of a claim or defense." Davidson, 43 Wn. App. at 573.

---

[42] Bienhoff also argues that the trial court infringed his constitutional right to present a defense when it excluded the evidence at issue. But Bienhoff does not offer significant argument in support of his contention that the trial court's rulings violated his constitutional rights. Rather, his arguments focus on whether the trial court abused its discretion when it excluded the evidence at issue. Therefore, we examine whether the trial court abused its discretion in making its evidentiary rulings.

We review a trial court's evidentiary rulings for abuse of discretion. State v. Halstien, 65 Wn. App. 845, 849-50, 829 P.2d 1145 (1992). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. In re Det. of Duncan, 167 Wn.2d 398, 402, 219 P.3d 666 (2009). "A decision is based on untenable grounds or for untenable reasons if the trial court applies the wrong legal standard or relies on unsupported facts." Duncan, 167 Wn.2d at 403.

Violation of an evidentiary rule is not grounds for reversal unless the defendant suffered prejudice. State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997). An error is not prejudicial "unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred." State v. Tharp, 96 Wn.2d 591, 599, 637 P.2d 961 (1981). Further, "[t]he improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole." Bourgeois, 133 Wn.2d at 403.

*Reed's Financial Situation*

Bienhoff argues that the trial court abused its discretion by applying the wrong legal standard to exclude certain evidence of Reed's poor financial status. Because the trial court properly exercised its discretion to admit only some evidence of Reed's financial situation, we disagree.

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues,

or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." ER 403.

"Evidence of poverty is generally not admissible to show motive." State v. Kennard, 101 Wn. App. 533, 541, 6 P.3d 38 (2000) (citing United States v. Mitchell, 172 F.3d 1104, 1108 (9th Cir. 1999)). But "[e]vidence concerning a defendant's bankruptcy and poor financial condition is admissible to show that the defendant was living beyond his means." Kennard, 101 Wn. App. at 540-41. In turn, evidence that the defendant was living beyond his means may be admissible to establish the defendant's motive to commit a crime if its probative value is not substantially outweighed by its potential prejudice. State v. Matthews, 75 Wn. App. 278, 283, 286, 877 P.2d 252 (1994) (holding that the trial court did not abuse its discretion when it admitted evidence of the defendant's recent bankruptcy and living beyond his means in trial for first degree murder where State's limited presentation of evidence did not make "any stigma of bankruptcy or poverty" the point of emphasis for the jury).[43]

---

[43] Bienhoff, relying on Matthews, contends that the trial court abused its discretion by holding him to an erroneous legal standard when it required him to offer evidence demonstrating that Reed was under "'enormous financial pressure.'" Br. of Appellant at 40 (quoting RP (Sept. 14, 2015) at 127). He argues that the trial court should have admitted evidence that Reed and his wife were living beyond their means. Matthews, 75 Wn. App. at 283-88.

The Matthews court held that a trial court does not abuse its discretion when it admits evidence showing that the defendant was living beyond his or her means after properly determining that the probative value of such evidence is not substantially outweighed by its prejudicial impact. 75 Wn. App. at 288. Matthews does not require trial courts to admit probative evidence of the defendant's financial situation even if they determine that the evidence is unduly prejudicial.

Here, the trial court used the phrase "enormous financial pressure" to evaluate whether each offered item of evidence of Reed's financial situation was substantially outweighed by its possible prejudicial impact on the jury. In doing so, it excluded evidence where its probative value was substantially outweighed by its possible prejudicial impact.

Here, Bienhoff sought to introduce evidence of Reed's financial situation before the incident in order to show that Reed intended to rob Bienhoff. Bienhoff offered evidence that Reed and his wife lacked steady employment, received public assistance, and maintained a lifestyle beyond their means. Bienhoff also sought admission of evidence that Reed pawned jewelry, attempted to prostitute his wife, and borrowed money from a third party who later threatened him.

The trial court ruled that Bienhoff could introduce evidence of Reed and his wife's lack of steady employment, that Reed had pawned a ring, and that Reed had borrowed money from a third-party seeking repayment. The trial court admitted a pawn slip for the ring, found in Reed's van, showing that payment was due four days after the incident occurred. The trial court stated that this evidence was admissible because it demonstrated that Reed was under "enormous financial pressure" when he met Bienhoff.[44]

The trial court excluded the remainder of Bienhoff's offered evidence after finding that its potential prejudicial impact substantially outweighed its probative value. This included six other pawn slips for items for which payments were not due close to the time of the incident.

The trial court properly weighed the probative value of each item of evidence against its potential prejudicial impact prior to deciding whether to admit the evidence under ER 403. The trial court limited the scope of the evidence admitted on the issue of whether Reed had a financial motivation supporting his

---

Thus, the trial court did not apply an erroneous legal standard to determine whether the evidence was relevant. We reject this argument.
[44] RP (Sept. 14, 2015) at 127-28.

alleged intent to rob Bienhoff under ER 403. The trial court noted that the evidence could paint Reed and his wife as undesirable people in the eyes of the jury. The trial court concluded that only evidence demonstrating that Reed was under "enormous financial pressure" when he met Bienhoff was sufficiently probative to be admissible under ER 403. We conclude that the trial court properly exercised its discretion to admit only some evidence of Reed's financial situation.

*Reed's Prior Criminal Charge*

Bienhoff argues that the trial court erred when it denied his request to admit evidence of Reed's prior criminal behavior. The State responds that the trial court properly barred the evidence as inadmissible propensity evidence under ER 404(b). We agree with the State.

"[E]vidence of prior misconduct is presumptively inadmissible." State v. Gresham, 173 Wn.2d 405, 421, 269 P.3d 207 (2012).

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

ER 404(b). The admission of evidence of other crimes "depend[s] on its relevance and the balancing of its probative value and danger of unfair prejudice; the list of other purposes in the second sentence of ER 404(b) is merely illustrative." Gresham, 173 Wn.2d at 420.

To admit evidence of a person's prior acts, "the trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether

the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect." State v. Vy Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002).

"The party seeking to introduce [ER 404(b)] evidence has the burden of establishing the first, second, and third elements." Gresham, 173 Wn.2d at 421.

Here, before trial, Bienhoff sought to admit evidence of a 2006 robbery charge against Reed. The State had charged Reed with first degree robbery based on the victim's claim that Reed threatened him with a gun and demanded money. The State's inability to find the victim resulted in the charge being dismissed without prejudice. The trial court barred evidence of Reed's prior charge under ER 404(b) as impermissible propensity evidence.

The trial court did not err in its ruling. Bienhoff had the burden of establishing that evidence of Reed's prior robbery charge was admissible under ER 404(b). But he failed to prove that Reed had committed the acts underlying his 2006 robbery charge by a preponderance of the evidence. The charge was based solely on the victim's report to police and identification of Reed from a photo lineup. But the charge was not brought to trial because the victim could not be found.

Without additional evidence, the dismissed charge is insufficient to demonstrate that Reed committed the alleged robbery. Therefore, we conclude that the trial court properly denied admission of the robbery charge as impermissible propensity evidence under ER 404(b).

24

*Bibb's Prior Gun Ownership*

Bienhoff argues that the trial court abused its discretion when it did not admit evidence of Bibb's prior gun ownership. The State contends that the trial court properly excluded the evidence under ER 404(b). We agree with the State.

Evidence of prior acts is "not admissible to prove the character of a person in order to show action in conformity therewith." ER 404(b).

A defendant's previous ownership of guns may be admissible when it is circumstantial evidence connecting him or her to the particular weapons that were used in the crime at issue. See State v. Hartzell, 156 Wn. App. 918, 930-32, 237 P.3d 928 (2010) (evidence connecting the defendants to the guns used in the crime was admissible as circumstantial evidence where its probative value was not outweighed by its prejudicial effect). But evidence that the defendant was in possession of a gun that was not used in the crime at issue may be barred as impermissible propensity evidence. State v. Freeburg, 105 Wn. App. 492, 500-01, 20 P.3d 984 (2001) (the trial court erred in admitting evidence that defendant was armed when arrested over two years after murder at issue occurred because the evidence was prejudicial and had little probative value, in part because the gun was not the one used in the murder).

Here, Bienhoff moved to admit evidence showing that Bibb had previously owned guns of the same caliber as those used in the incident and that he had experience with and knowledge of guns. The trial court excluded evidence of Bibb's prior gun ownership under ER 404(b), but allowed Bienhoff to ask Bibb whether he was armed at Woodland Park, whether he owned guns of the same

caliber as those used in the incident when the incident occurred, and whether he had been able to tell if the gun that had been fired at him was a revolver or a semiautomatic.

The trial court properly determined that evidence of Bibb's prior ownership of guns of the same caliber as those used in the incident was inadmissible under ER 404(b). Bibb testified that he was not armed at Woodland Park on the day of the incident. There was no evidence at trial that Bibb had ever owned or possessed the weapons that were used during the incident. Absent such evidence, Bienhoff cannot show that Bibb's previous gun ownership was relevant to the present case beyond showing that Bibb was a gun owner who participated in an incident that involved guns. Thus, evidence of Bibb's past ownership of guns constitutes impermissible propensity evidence under ER 404(b), and we conclude that the trial court did not abuse its discretion when it excluded the evidence.

Bienhoff argues that the trial court abused its discretion by improperly precluding him from attacking Bibb's credibility through cross-examination about his prior gun ownership. Because Bibb's response would implicate the evidence of his prior ownership that the trial court correctly determined was inadmissible under ER 404(b), we disagree.

The trial court may exercise its discretion to permit a party to cross-examine a witness on specific instances of conduct to attack or support the witness's credibility. ER 608(b). The instances must be probative of truthfulness or untruthfulness. ER 608(b). "Failing to allow cross-examination of a state's witness under ER 608(b) is an abuse of discretion if the witness is crucial and the alleged

26

misconduct constitutes the only available impeachment." State v. Clark, 143 Wn.2d 731, 766, 24 P.3d 1006 (2001). Defendants have greater latitude to attack the credibility of witnesses on cross-examination. State v. York, 28 Wn. App. 33, 36, 621 P.2d 784 (1980).

Here, Bienhoff argued that evidence of Bibb's previous gun ownership was admissible under ER 608(b) because Bibb had incorrectly stated in a defense interview that he had not owned a .45 caliber handgun, although in 2011 he had reported that such a weapon had been stolen from his vehicle. The trial court denied his request to admit evidence of Bibb's response.

The trial court did not improperly infringe on Bienhoff's right to cross-examine Bibb about his prior gun ownership. As discussed above, evidence of Bibb's prior ownership of guns constituted impermissible propensity evidence under ER 404(b). Allowing Bienhoff to impeach Bibb's credibility through his answer to a question on the same issue would alert the jury to the evidence the trial court properly barred.

Further, other evidence in the record could have been used to impeach Bibb's testimony that he was not armed at the incident. For example, Cadaret testified that the driver of the Cadillac exited his vehicle, stood in front of Reed's van, and extended his arm. Therefore, we conclude that the trial court did not abuse its discretion when it prohibited Bienhoff from cross-examining Bibb on his answer to the defense interview question.

## Judicial Comment on the Evidence

Bienhoff argues that the trial court improperly commented on the evidence when it instructed the jury that Lyons made oral assertions to his acquaintance Hiram Warrington. Warrington testified that Lyons had told him what happened at Woodland Park on the day the incident occurred, and that he overheard a conversation about the incident between Lyons and Pierce. Bienhoff contends that the trial court's limiting instruction to the jury regarding Warrington's testimony implied that the conversation occurred, where that fact was disputed at trial. Because the trial court's limiting instruction did not convey the judge's personal opinion to the jury or inform the jury whether he believed Warrington's testimony, we disagree.

"Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." WASH. CONST. art. IV, § 16. This provision prevents the jury "from being influenced by knowledge conveyed to [them] by the court as to the court's opinion of the evidence submitted." Heitfeld v. Benevolent & Protective Order of Keglers, 36 Wn.2d 685, 699, 220 P.2d 655 (1950).

"An impermissible comment is one which conveys to the jury a judge's personal attitudes toward the merits of the case or allows the jury to infer from what the judge said or did not say that the judge personally believed or disbelieved the particular testimony in question." Hamilton v. Dep't of Labor & Indus., 111 Wn.2d 569, 571, 761 P.2d 618 (1988). A court's improper comment giving its opinion may be express or implied. State v. Levy, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006).

28

The prohibition on judicial comments on the evidence is strictly applied. City of Seattle v. Arensmeyer, 6 Wn. App. 116, 120, 491 P.2d 1305 (1971). A claim of improper judicial comment implicates manifest constitutional error and may be raised for the first time on appeal. Levy, 156 Wn.2d at 719-20.

Appellate courts review whether an instruction amounts to a comment on the evidence de novo. State v. Butler, 165 Wn. App. 820, 835, 269 P.3d 315 (2012).

Here, Warrington testified that he had a conversation with Lyons on the day of the incident, and that he was present when Lyons and Pierce discussed the incident. Lyons denied that either conversation occurred. While Warrington was testifying that Lyons had told him about the incident on the day it occurred, the trial court instructed the jury that "[t]estimony regarding any oral assertions made by Ray Lyons to Hiram Warrington may be considered by you only for the purpose of impeaching Ray Lyons'[s] credibility. You may not consider it for any other purpose."[45]

The trial court's limiting instruction to the jury did not constitute an impermissible judicial comment on the evidence because it did not convey the trial court's attitude toward the merits of the case or belief in Warrington's testimony to the jury. The trial court's limiting instruction directed the jury to only consider testimony regarding *any* oral assertions made by Lyons to Warrington for the purpose of impeaching Lyons's credibility. The instruction did not reference the oral assertions or otherwise remove the determination of whether the oral

---

[45] RP (Oct. 20, 2015) at 2783.

assertions occurred from the jury. Also, the focus of the trial court's instruction was to limit the jury's consideration of Warrington's testimony, not to establish the factual basis of that testimony. Thus, the trial court's limiting instruction did not convey the court's attitudes toward the merits of the case or decide a disputed issue of fact.

Further, the trial court's limiting instruction did not favorably compare Warrington's credibility to that of Lyons's. Warrington's testimony was offered to impeach Lyons's testimony. The trial court's limiting instruction simply told the jury to consider his testimony for this purpose alone, rather than for the substance of Lyons's alleged statements. It did not suggest that Warrington himself was credible or that the trial court personally believed Warrington's testimony.

Bienhoff argues that the trial court impermissibly commented on the evidence because the limiting instruction informed the jury that Bienhoff was lying when he denied any intent to rob Reed. But this ignores the substance of the trial court's limiting instruction. The trial court's instruction informed the jury that it could not consider Warrington's testimony about what Lyons told him for any purpose other than to impeach Lyons's credibility.

Juries are presumed to follow the instructions of the court. State v. Dye, 178 Wn.2d 541, 556, 309 P.3d 1192 (2013). Thus, the jury presumptively did not consider Warrington's testimony for the truth of the matter asserted in Lyons's statements. Bienhoff has not provided argument or citation in the record to overcome this presumption. We reject this argument.

In sum, the trial court's limiting instruction did not convey the judge's personal attitudes toward the merits of the case or suggest that Warrington himself was credible. We conclude that the trial court's limiting instruction was not an impermissible comment on the evidence.

### Excusable Homicide Jury Instruction

Bienhoff argues that the trial court erred when it declined to instruct the jury on excusable homicide. Because an instruction on excusable homicide was not appropriate in light of Bienhoff's charged crime and the parties' theories at trial, we disagree.

"A defendant in a criminal case is entitled to have the jury fully instructed on the defense theory of the case." State v. Staley, 123 Wn.2d 794, 803, 872 P.2d 502 (1994). Failure to fully instruct the jury is prejudicial error. State v. Riley, 137 Wn.2d 904, 908 n.1, 976 P.2d 624 (1999).

First or second degree murder may be based on a killing that occurs in the course of and in furtherance of a felony or in immediate flight therefrom. RCW 9A.32.030(1)(c); RCW 9A.32.050(1)(b). The State must prove that the defendant had the intent required to commit the underlying felony, not the intent required to prove first or second degree murder. State v. Craig, 82 Wn.2d 777, 781-83, 514 P.2d 151 (1973). "Even if the murder is committed more or less accidentally in the course of the commission of the predicate felony, the participants in the felony are still liable for the homicide." State v. Bolar, 118 Wn. App. 490, 504, 78 P.3d 1012 (2003) (citing State v. Leech, 114 Wn.2d 700, 708, 790 P.2d 160 (1990)).

"Homicide is excusable when committed by accident or misfortune in doing any lawful act by lawful means, without criminal negligence, or without any unlawful intent." RCW 9A.16.030.

"[A] trial court's refusal to give an instruction [to the jury] based upon a ruling of law is reviewed de novo." State v. Walker, 136 Wn.2d 767, 772, 966 P.2d 883 (1998).

Here, Bienhoff was charged with murder in the first degree by reason of causing Reed's death while committing or attempting to commit the crime of robbery in the first degree. Bienhoff argued that the trial court should instruct the jury on excusable homicide with modified self-defense language.[46]

The trial court declined to instruct the jury on excusable homicide. The trial court concluded that Bienhoff and Pierce could not argue that Bienhoff lawfully used force during the incident because self-defense is not a defense to robbery. Further, the trial court noted that the jury's decision hinged on whether they found that Bienhoff had attempted to rob Reed. If the jury determined that Bienhoff did not attempt to rob Reed, Bienhoff would not be guilty of the charged crime. But if the jury determined that Bienhoff did attempt to rob Reed, then justifiable homicide was not available because his use of force was not done during a lawful act.

The trial court did not err when it declined to instruct the jury on excusable homicide. For an excusable homicide instruction to be available, Bienhoff would have to demonstrate that he was acting lawfully by lawful means. A determination that Bienhoff was acting in furtherance of or with intent to commit robbery when

---

[46] Bienhoff did not submit a proposed excusable homicide instruction.

Reed died would necessarily establish that he was not acting lawfully by lawful means. Therefore, if the State carried its burden of proving that Bienhoff caused Reed's death while he was acting in furtherance of or with intent to commit robbery, an instruction on excusable homicide would be inappropriate.

Further, Bienhoff's theory at trial was that he intended to sell Reed marijuana. Bienhoff claimed that Reed's death was an accident that occurred when Reed pulled out a gun during the transaction. But even if the jury determined that Bienhoff established his theory of the case, they would not reach the issue of whether Reed's death was an excusable homicide. Bienhoff was solely charged with felony murder predicated on robbery. Robbery was a necessary prerequisite for the felony murder charge.

Thus, if the jury determined that Bienhoff met Reed with the intent to sell him marijuana, rather than the intent to rob him, the State would have failed to establish the predicate felony and Bienhoff would have been found not guilty. Without the underlying robbery, the jury would never reach the issue of whether Bienhoff caused Reed's death. Thus, under the facts of the present case, even if Bienhoff successfully argued his theory of the case at trial, the trial court did not err in declining to instruct the jury on excusable homicide.

Bienhoff argues that binding Washington case law requires that the jury be instructed on excusable homicide in felony murder cases where the facts support the instruction. We disagree.

In State v. Brightman, the defendant was charged with premeditated first degree intentional murder and in the alternative with first degree felony murder

based on robbery after he allegedly killed the victim during a car theft. 155 Wn.2d 506, 509-11, 122 P.3d 150 (2005). The Washington Supreme Court noted that the proper defense to an accidental killing is excusable homicide, not justifiable homicide as argued by the defendant at trial. Brightman, 155 Wn.2d at 513, 525-26. After reversing for an open courts violation, the Washington Supreme Court noted that, if the defendant argued on remand that he "committed an excusable homicide that was precipitated by an act of self-defense," the trial court would have to determine whether he had raised sufficient supporting evidence. Brightman, 155 Wn.2d at 526.

In State v. Slaughter, the defendant was charged with second degree intentional murder and in the alternative with second degree felony murder based on assault. 143 Wn. App. 936, 941, 186 P.3d 1084 (2008). The Court of Appeals affirmed the trial court's instruction to the jury on excusable homicide where the defendant argued that, after he and the victim struggled over possession of a crack pipe, he fatally stabbed the victim while defending himself from the victim's assault. Slaughter, 143 Wn. App. at 940-41, 944-47. The Court of Appeals noted that the facts of the case supported the defendant's request for an excusable homicide instruction. Slaughter, 143 Wn. App. at 945-47.

The cases cited by Bienhoff are distinguishable from the present case. Brightman and Slaughter involved charges of intentional murder with charges in the alternative of felony murder. As discussed above, Bienhoff was solely charged with felony murder predicated on robbery. He was not charged with a separate violent crime that could necessitate giving an instruction on excusable homicide.

Thus, neither Brightman nor Slaughter control the outcome of the present case. In light of Bienhoff's charged offense, the facts of the present case, and the parties' theories at trial, the jury would not reach the issue of whether Reed's death was an excusable homicide. The trial court properly declined to issue an excusable homicide instruction.

## Alternate Juror

Bienhoff argues that the trial court erred when it sat a previously dismissed alternate juror without inquiring whether that alternate juror had remained protected from outside influence. The State argues the trial court properly instructed the alternate jurors during the trial against conducting outside research and that there is no evidence that the alternate juror failed to adhere to the trial court's instructions after being dismissed. We agree with the State.[47]

> Alternate jurors who do not replace a regular juror may be discharged or temporarily excused after the jury retires to consider its verdict. When jurors are temporarily excused but not discharged, the trial judge shall take appropriate steps to protect alternate jurors from influence, interference or publicity, which might affect that juror's ability to remain impartial and the trial judge may conduct brief voir dire before seating such alternate juror for any trial or deliberations.

CrR 6.5. An alternate juror "may be recalled at any time that a regular juror is unable to serve." CrR 6.5.

---

[47] The State argues that Bienhoff may not raise this issue for the first time on appeal. But a party may raise a claim of error for the first time on appeal that constitutes "manifest error affecting a constitutional right." RAP 2.5(a)(3). A trial court's failure to examine whether a temporarily excused alternate juror has been protected from outside influence may be raised for the first time on appeal. State v. Ashcraft, 71 Wn. App. 444, 463, 463 n.7, 859 P.2d 60 (1993) (this issue relates "directly to a defendant's constitutional right to a fair trial before an impartial jury and to a unanimous verdict"). Thus, Bienhoff's argument implicates his rights to a fair trial, a trial by jury, and a trial by an impartial jury, and may be raised for the first time on appeal as a claim of manifest error affecting a constitutional right.

In <u>State v. Chirinos</u>, the trial court temporarily excused an alternate juror and told her that she could be recalled, saying, "'So I would appreciate you continuing to abide by that admonition not to discuss the case with anyone until you find out the jury has reached a verdict.'" 161 Wn. App. 844, 846-47, 255 P.3d 809 (2011). This court concluded that the trial court "properly instructed [the alternate juror] . . . to continue to abide by her obligation to not discuss the case" and that this admonishment was sufficient to protect her from outside influence under CrR 6.5. <u>Chirinos</u>, 161 Wn. App. at 850.

Juries are presumed to follow the trial court's instructions. <u>Dye</u>, 178 Wn.2d at 556.

The trial court has the discretion to conduct a formal proceeding to insure that an alternate juror that has been recalled has remained protected from outside influence. CrR 6.5; <u>Chirinos</u>, 161 Wn. App. at 848-49.

Here, at the beginning of trial, the trial court instructed the jury to avoid reading anything about the case or discussing it with others in order to prevent extraneous influence. The trial court reminded the jury not to conduct outside research about the case or discuss the case with others prior to each weekend recess. At the close of the parties' arguments and prior to dismissing the jury on a Thursday, the trial court instructed the alternate jurors, "It won't be necessary for you to serve further. Please don't discuss the case with anyone or indicate how you would have voted until the jury returns [their] verdict."[48] The trial court recalled the alternate jurors the following Monday and sat one of the alternates.

---

[48] RP (Oct. 29, 2015) at 3898.

In light of the trial court's instructions to the jury during the trial and to the alternates in particular after the close of the parties' arguments, it adequately protected the alternate jurors from outside influence. During the trial, the trial court repeatedly instructed the jury, including the alternates, not to conduct outside research or discuss the case with others. As in Chirinos, the trial court admonished the alternate jurors not to discuss the case with anyone until the verdict was reached. The trial court did not instruct the alternate jurors that its prior instructions no longer applied to them or that they were free to conduct outside research. Therefore, the trial court adequately protected the alternate jurors from outside influence between when they were dismissed and when they were recalled.

Further, the trial court did not abuse its discretion when it did not conduct additional voir dire of the alternate juror to ensure against exposure to outside influences. As discussed above, the trial court repeatedly instructed the jury against conducting outside research or discussing the case over the course of the trial. When it dismissed the alternates, the trial court reminded them to not discuss the case with others and did not otherwise release them from their existing obligations. The trial court recalled the alternates after three non-court days had passed and before the jury had begun its deliberations. Further, the parties were on notice that the trial court intended to sit an alternate juror from the e-mail exchange between the parties and the court following the defense's concerns over a sitting juror. Therefore, the trial court acted within its discretion when it did not conduct additional voir dire of the alternate juror.

Bienhoff argues that the trial court's admonishment of the jurors is insufficient under the Washington Supreme Court Committee on Jury Instructions' (the Committee) recommendations. This is unpersuasive. The WPICs are not binding on trial courts, and Bienhoff has not cited binding legal authority in support of this argument. See WPIC 0.10; RAP 10.3(a)(6). We reject his argument.

## Jury Unanimity

Bienhoff argues that the trial court violated his constitutional rights to a fair trial and a unanimous jury verdict when it failed to instruct the jury that their deliberations had to include all jurors. The State argues that the trial court properly instructed the jurors that any verdict must be the unanimous result of common deliberations. We agree with the State.[49]

Criminal defendants have a right to a trial by jury and a right to a unanimous verdict by the jury. WASH. CONST. art. I, § 21; State v. Ortega-Martinez, 124 Wn.2d 702, 707, 881 P.2d 231 (1994).

"'The requirement that 12 persons reach a unanimous verdict is not met unless those 12 reach their consensus through deliberations which are the common experience of all of them.'" State v. Lamar, 180 Wn.2d 576, 585, 327

---

[49] The State argues that Bienhoff cannot raise this issue for the first time on appeal because he cannot show that any instructional error had practical and identifiable consequences in the trial. But a party may raise a claim of error for the first time on appeal that constitutes "manifest error affecting a constitutional right." RAP 2.5(a)(3). An erroneous instruction to the jury regarding unanimity is a manifest error affecting the constitutional rights to a jury trial and a unanimous verdict. State v. Lamar, 180 Wn.2d 576, 586, 327 P.3d 46 (2014) (concluding that an instruction that directed the jury to not begin deliberations anew after seating an alternate juror was manifest constitutional error, and noting that prior cases have held that "jury instructions that fail to require a unanimous verdict constitute manifest error affecting a constitutional right"). Here, Bienhoff argues that the trial court failed to instruct the jury that any deliberations must involve all 12 jurors, and therefore violated his right to a unanimous jury verdict. Thus, under Lamar, he has alleged a manifest constitutional error that can be raised for the first time on appeal.

P.3d 46 (2014) (quoting People v. Collins, 17 Cal. 3d 687, 693, 552 P.2d 742, 131 Cal. Rptr. 782 (1976)). A unanimous jury vote requires that the jury reaches a consensus after each juror examines the evidence and the parties' arguments, in light of the jury instructions, and after the jury deliberates. Lamar, 180 Wn.2d at 585.

In State v. Lamar, the Washington Supreme Court noted that the trial court gave the jury an instruction about deliberating together to reach a unanimous verdict:

> "As jurors, you have a duty to discuss the case with one another and to deliberate in an effort to reach a unanimous verdict. Each of you must decide the case for yourself, but only after you consider the evidence impartially with your fellow jurors. During your deliberations, you should not hesitate to re-examine your own views and to change your opinion based upon further review of the evidence and these instructions. You should not, however, surrender your honest belief about the value or significance of evidence solely because of the opinions of your fellow jurors. Nor should you change your mind just for the purpose of reaching a verdict."

180 Wn.2d at 580. The court later stated that, "before the jury deliberations commenced . . . , the jurors were instructed to deliberate together in the constitutionally required manner." Lamar, 180 Wn.2d at 585.

Constitutional issues are questions of law that are reviewed de novo. Gresham, 173 Wn.2d at 419.

Here, the trial court gave the jury an instruction to deliberate together that was identical to that given in Lamar.[50] The trial court also instructed the jurors that

---

[50] "As jurors, you have a duty to discuss the case with one another and to deliberate in an effort to reach a unanimous verdict. Each of you must decide the case for yourself, but only after you consider the evidence impartially with your fellow jurors. During your deliberations, you should not hesitate to re-examine your own views and to change your

they each had a right to be heard, and that, "[b]ecause this is a criminal case, each of you must agree for you to return a verdict."[51] Thus, the trial court's instructions properly informed the jury that they had to deliberate together in the constitutionally required manner and that they had to reach a unanimous verdict. The trial court did not err by failing to instruct the jury to reach a unanimous verdict after conducting common deliberations.

Bienhoff argues that the trial court failed to instruct the jury in accordance with the Committee's recommendations, and thus failed to guarantee that the verdict was the product of unanimous jury deliberations. This is unpersuasive. Bienhoff has not cited legal authority holding that the particular recommendations that he relies on are binding on trial courts, or that a trial court's failure to follow them constitutes reversible error. RAP 10.3(a)(6). We reject his argument.

Bienhoff argues that the trial court erred when it failed to admonish the jury against discussing the case with anyone each time there was a recess, relying on WPIC 4.61, and thus there was a possibility that improper deliberations occurred. Juries are presumed to follow the trial court's instructions. Dye, 178 Wn.2d at 556. Here, the trial court instructed the jury at the beginning of trial, "Do not discuss this case among yourselves or with anyone else. Do not permit anyone to discuss it with you or in your presence."[52] Bienhoff has not cited evidence that the jury did

---

opinion based upon further review of the evidence and these instructions. You should not, however, surrender your honest belief about the value or significance of evidence solely because of the opinions of your fellow jurors. Nor should you change your mind just for the purpose of reaching a verdict." Clerk's Papers (CP) at 444; Lamar, 180 Wn.2d at 576.
[51] CP at 468.
[52] RP (Sept. 24, 2015) at 1033.

not comply with the trial court's instruction against discussing the case with other jurors or anyone else.[53] We reject this argument.

In sum, we conclude that the trial court did not infringe Bienhoff's rights to a jury trial or to a unanimous verdict because the trial court's instructions properly directed the jury to reach a unanimous verdict after conducting common deliberations.

### Cumulative Error

Bienhoff argues that he was deprived of a fair trial because of the trial court's cumulative errors. "Under the cumulative error doctrine, [an appellate court] may reverse a defendant's conviction when the combined effect of errors during trial effectively denied the defendant [of his or] her right to a fair trial, even if each error standing alone would be harmless." State v. Venegas, 155 Wn. App. 507, 520, 228 P.3d 813 (2010).

Here, the prosecutorial misconduct in voir dire was the only error which requires a new trial. Because we reject Bienhoff's other arguments, we conclude that he has not demonstrated that there was cumulative error.

Reversed and remanded for a new trial.

Trickey, J

I CONCUR:

_[signature]_

---

[53] Bienhoff argues that the jurors had opportunities to discuss the case with each other, but does not provide evidence that the jurors actually did so. Bienhoff also argues that the jury was not instructed to not discuss the case with non-jurors. But this ignores the language of the trial court's instruction, which prohibited jurors from discussing the case with other jurors or with anyone else. We reject his arguments.